J. G. BOSWELL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

J. G. BOSWELL COMPANY (SUCCESSOR BY MERGER TO TULARE LAKE LAND COMPANY), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61846, 66655.   Filed June 23, 1960.

*Melvin D. Wilson, Esq.,* and *Melvin H. Wilson, Esq.,* for the petitioners.

*Mark Townsend, Esq.,* and *Michael P. McLeod, Esq.,* for the respondent.

OPINION.

VAN FOSSAN, *Judge:* The sole issue is whether Boswell sustained a loss in the fiscal year ended June 30, 1952, by reason of the inundation of its ranches, and whether Tulare sustained a loss in the fiscal year ended March 31, 1953, for the same reason, within the meaning of section 23(f) of the Internal Revenue Code of 1939.[4]

Petitioner argues that it sustained a loss in the total amount of $1,695,619.06. Of this amount, $704,940.20 was attributed to the Boswell lands and claimed as a loss for the fiscal year ended June 30, 1952. The balance was Tulare land and the loss is claimed for the year ended March 31, 1953.

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

Petitioner measured the loss as to the alleged difference between the estimated fair market value of the land before the flood and the estimated value on June 30, 1952. The amounts actually claimed for the several ranches are either the differences in alleged value as computed by petitioner or the adjusted basis, whichever is the lesser amount. There were no sales in the taxable years. Petitioner's computation is as follows:

| Ranch | Estimated value [1] | | Alleged loss in value | | |
|---|---|---|---|---|---|
| | Jan. 1, 1952, or before flood (per acre)[2] | June 30, 1952, or flood crest (per acre)[2] | Decrease in value (per acre) | Deductible loss (total) | Adjusted basis of the several ranches |
| Richland | $267.50 | $170.00 | $97.50 | $48,883.58 | $55,001.16 |
| Johnson | 190.00 | 117.50 | 72.50 | 1,856.44 | 1,856.44 |
| Cousins | 255.00 | 150.00 | 105.00 | 524,791.05 | 537,201.14 |
| Dunn | 108.00 | 56.60 | 51.40 | 74,221.60 | 137,477.87 |
| Brown | 87.50 | 46.00 | 41.50 | 55,187.53 | 130,117.70 |
| RD 749 | 337.50 | 225.00 | 112.50 | 963,799.31 | 963,799.31 |
| Section 3 | 115.00 | 62.50 | 52.50 | 26,879.55 | 26,879.55 |

[1] Average values as between petitioner's two witnesses.
[2] The expert witnesses valued the land with acreage figures which differed in minor respects from the stipulated acreage.

Petitioner argues that the flood caused permanent injury to the lands. On brief, petitioner alleges that the injury was made up of the following elements:

1. Petitioner lost the use of its lands for an indefinite period of time.
2. The flood physically injured petitioner's lands.
3. The flood permanently added salts to the soil, which cannot be removed from the soil and which shorten the time in which the land can be used for farming purposes.
4. Reduction in cotton "history."

Respondent contends that only physical damage or injury to petitioner's land will support a loss, and, since all physical damages have been repaired and a deduction taken and allowed for the costs, any change in value was a mere fluctuation which provides no basis for claiming a loss.

Section 23 (f) permits corporations to deduct losses sustained during the taxable year and not compensated for by insurance or otherwise. As above noted, petitioner received no insurance proceeds or other compensation because of the flood.

Section 29.23 (f)-1, Regs. 111, paraphrases the statute but provides that sections 29.23 (e)-1 to 29.23 (e)-5 are generally applicable to corporations as well as individuals.

Section 29.23 (e)-1, Regs. 111, contains what has become accepted "law" with reference to the deduction of losses generally. The section reads in part as follows:

In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable

events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. * * *

The requirements of the rule can be stated as follows: (1) There must be an actual loss; (2) the "person" claiming the loss must sustain it; (3) the loss must be evidenced by a closed and completed transaction; (4) the loss must be fixed by an identifiable event; and (5) the loss must be sustained in the year claimed as a deduction.

We may limit consideration of (4) since the flood constituted an identifiable event fixing the onset of the damage, if any, and (2) because the loss, if any, was that of petitioner.

It is vital to a loss that something of value be parted with, i.e., the petitioner must have suffered a "loss" in the economic sense. Bookkeeping entries and paper losses are not sufficient. Cf. *A. Giurlani & Bro.* v. *Commissioner*, 119 F. 2d 852, 857 (C.A. 9), affirming 41 B.T.A. 403.

In support of its claim petitioner points to the loss of income from the flooded lands.

The Code contemplates only a loss of capital, or, in other words, actual loss of tangible or measurable property. This does not encompass a failure of profits or the loss of potential income. *Hort* v. *Commissioner*, 313 U.S. 28. The respondent was correct in disallowing the loss insofar as it was based on loss of profits.

Petitioner next argues that the flood caused great physical damage to the farmlands. Petitioner's claim for the loss is not advanced by this contention. Whatever physical damage was occasioned by the flood has been repaired and a deduction taken and allowed for the expense. Restoration has been made and the land continues in use for farming purposes.[5]

It may be agreed that new insecticides and fertilizers, improved methods of irrigation, better seeds, and the eradication of disease may account for much of the increase in production, but such fact

---

[5] The following are representative acreage figures for cotton and barley for the ranches indicated for the year immediately prior to and the years after the flood:

| Year | Cousins District (Cousins, Brown, and Dunn ranches) | | Tulare Lake Land Co. (RD 749 and Section 3 ranches) | | Richland ranch | |
|---|---|---|---|---|---|---|
| | Cotton | Barley | Cotton | Barley | Cotton | Barley |
| 1951 | 3,429 | ----------- | 10,052 | 758 | 845 | (1) |
| 1952 | | | | (2) | 863 | 1,398 |
| 1953 | ----------- | 8,497 | 10,118 | ----------- | 1,520 | 812 |
| 1954 | 2,084 | 6,601 | 6,871 | 3,539 | 2,500 | 1,895 |
| 1955 | 4,027 | 5,186 | 3,552 | (2) | 1,072 | 1,767 |

[1] Unknown.
[2] Unknown to the Court.

does not lessen the impact of the other fact that the land is producing approximately as much as prior to the flood.

Nor is a possible diminution of cotton "history" a loss recognized by the Code. Such damage is at best speculative. Petitioner refers to this claim in the following words: "The *possible* loss of cotton history due to the inability to plant cotton while the land was under water." (Italics supplied.) Assuming, *arguendo*, that there would be damage from the loss of the cotton "history," it would not be in 1952 or 1953, but in future years, if and when the acreage was limited. Moreover, the loss must be evidenced by a closed and completed transaction. The flood "opened" the transaction (i.e., the loss), but it would not be "closed," so far as history is concerned, until future years. The flood of 1952 gave rise to no damages in the taxable years in this respect. Respondent was correct in not allowing any loss based upon this contention.

It is our opinion that the Commissioner was correct also in disallowing a deduction for the alleged loss suffered because of the addition of salt to the land.

The loss claimed here is damage to farmland due chiefly to the deposit by floodwaters of additional amounts of various salts on the topsoil level of the land, some of which salt was brought in by the floodwaters and some of which was allegedly raised from lower levels of the soil by the presence of the floodwaters. These are natural processes which have been going on for generations with respect to the land. Obviously, everyone familiar with the land expected that periodic floods would occur from time to time.

The use of water on the land for irrigation purposes, which is necessary, contributed to the same conditions but to a somewhat lesser degree. When the land is again free from the floodwaters, the soil can be reconditioned for normal farming without undue delay. The restoration expenses are deductible just as the other expenses of rehabilitation following the floods. In the instant case such expenses were claimed and allowed as deductions and are not in dispute here. Much low-lying farmland throughout the great Middle West farm section of the country requires reconditioning before planting because of floods that occur frequently during the winter and spring seasons. In the present case, the reconditioning is made necessary by a similar cause, and the controlling principle would seem to be the same.

We have no precise measurement of salt damage or salt increase to each section of land. The tests on the Cousins ranch indicate a varying range of increase in salt content. However, the tests were made in 1948 and 1958. Some of the salt found in 1958, we do not know how much, was added both before and after the flood of

1952 by irrigation waters and by the floods in 1955 and 1958. No tests were made on the remaining ranches. A part of the salt measured undoubtedly was present in the soil because of post-1948 irrigation. In short, conditions other than the actual floodwaters of 1952 may account for a large portion of the added salt.

Petitioner theoretically computed the loss as the difference in the fair market value of the land before the flood and on June 30, 1952. However, as noted above, various unallowable factors entered into the application of all of the various valuation methods used by petitioner's witnesses, among them amounts representing normal fluctuation in values. *Citizens Bank of Weston*, 28 T.C. 717, affd. 252 F. 2d 425 (C.A. 4); *Clarence A. Peterson*, 30 T.C. 660; *Richard A. Dow*, 16 T.C. 1230. To estimate the worth of the land on June 30, 1952, one of petitioner's witnesses considered: Uncertainty as to when the land would be dewatered, uncertainty as to flood damage, possible loss of cotton "history," additions of salt to the land, and loss of income. Another witness, for the same date, considered: Past history of the basin, commodity market of that date, the condition of the soil before the flood and the projected damage to the land, the lack of possible buyers, the cost of repairing the land, and the loss of income while the land was under water. These factors coincide roughly with the elements petitioner assigned as the basis of its loss. We have considered their applicability as a basis for a loss deduction in our previous discussion and have found them lacking in legal support.

The witnesses also estimated that the value of the land was lessened because prospective purchasers would have weighed the fact that they could not crop the land for a year or more after the flood. The loss, then, is said to be the difference between the amount a purchaser would be willing to pay for the land with the prospect of immediate income and that which he would pay with uncertain income. This was based in part on the prospect that the land would be in damaged condition when it came out of water. These witnesses were of the opinion that there is an almost complete lack of prospective purchasers for land standing in water. No land was placed up for sale in the area while it was under floodwaters in 1952–1953, and no sales were made.

We view this as a temporary condition. Boswell itself bought the Cousins ranch while it was under water and sold part of that same tract to the R. A. Rowan Company, both in 1946. An informed buyer would know that the floods normally came in the spring of the year and roughly how long the floods could be expected to last. The usual practice of farmers in the basin was to remove the water as quickly as possible after the flood.

Expert opinion and reports of various governmental flood control agencies were available to report on the flood, its progress and conditions. A civil engineer employed by petitioner estimated, as of July 17, 1952, that the basin would be dry about September 1, 1953.

The Cousins ranch was drained in the summer of 1946 and cropped in 1947. A large portion of petitioner's flooded lands was back in production within a year after the flood. This was the history of the basin. All of the foregoing would be persuasive to an informed buyer that there is no great delay between flooding and subsequent planting.

Petitioner further argues that a purchaser would still be reluctant since he would not know whether more floods or floodwater would be coming. This argument indicates that the alleged loss in value was chiefly the psychological result of fear on the part of prospective buyers of damage that might be sustained in future years as a result of floods, contemplated as possible and even probable, but which had not yet occurred and which might never occur. Petitioner's experts considered the likelihood of future floods in making their evaluations. Obviously, such a fear on the part of prospective buyers was not caused solely by the flood which occurred in 1952 but by a history of flood damage extending over half a century. Furthermore, this factor loses much of its weight since flood control is entirely possible and measures are being taken which will greatly lessen the possibility of future floods.

It was testified that when the damage to the properties was repaired, when the initial shock of the flood had subsided, and the land was back in crops, the land might regain much, if not all, of its preflood value.

From the foregoing we are of the view that petitioner, in claiming a loss of $1,695,619.06, is seeking a deduction based on unallowable factors, including loss of profits and a fluctuation in the value of the farms which it has continued to own and from which it has continued to achieve approximately as large an agricultural production as before the flood. *Mrs. J. C. Pugh, Sr., Executrix,* 17 B.T.A. 429, affd. 49 F. 2d 76 (C.A. 5), certiorari denied 284 U.S. 642.

Respondent's expert witness testified that the land in fact lost no value because of the flood, that the land was at least as productive postflood as preflood. The physical damage had been repaired, and the cost allowed as a deduction.

Present irrigation is raising the benched water table and possibly adding some salt. However, measures are being taken to perform preventive drainage so that irrigation waters will not accumulate and raise the benched water table. Such measures will reduce the salt content of the land and in part remove the dangers.

Modern techniques of agriculture are making it possible to leach the salts deeper and more quickly. In view of modern farming technology, new means may be found to remove the problem altogether.

In these circumstances, we consider the admonishment of the Court of Appeals for the Fourth Circuit, speaking through Judge Soboloff, in *Citizens Bank of Weston* v. *Commissioner*, 252 F. 2d 425 (C.A. 4), as controlling:

In a doubtful situation like this, if a deduction were allowed from the current year's earnings and the tax basis of the property were correspondingly reduced, then logically * * * [if the flood control plan were achieved and the salt problem taken under control by means of modern technology], restoration of the deduction would be required. Then might come other turns of the wheel, necessitating under the rule urged by the petitioners still other adjustments up or down. The scheme of our tax laws does not, however, contemplate such a series of adjustments to reflect the vicissitudes of the market, or the wavering values occasioned by a succession of adverse or favorable developments.

Where, as here, the petitioner, after the interruption, continues to use the land for its normal agricultural purposes and the possibility is not remote that much of the danger of the added salt, if any, will be removed in the future, no deduction is allowable.

Here, there is only an attempted mental subdivision of elements of value in the land, and an estimated depreciation without any actual sale, conversion, or abandonment of the land by the owner. A loss is not sustained during the taxable year within the meaning of the statute unless ascertained and realized more definitely than by an opinion of changed market value. *Mrs. J. C. Pugh, Sr., Executrix, supra; Citizens Bank of Weston* v. *Commissioner, supra.*

*Decisions will be entered under Rule 50.*