**J. G. BOSWELL COMPANY and J. G. Boswell Company (Successor by merger to Tulare Lake Land Company), Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 17140.**

United States Court of Appeals Ninth Circuit.

April 17, 1962.

Melvin D. Wilson and Melvin H. Wilson, Los Angeles, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division; Lee A. Jackson, Loring W. Post, Burt J. Abrams, and Meyer Rothwacks, Attys., Department of Justice, Washington, D. C., for respondent.

Before CHAMBERS, STEPHENS and HAMLIN, Circuit Judges.

STEPHENS, Circuit Judge.

In the spring of 1952, the Tulare Lake Basin was inundated by a snow-melt run-off flood. Petitioner claimed that it had sustained a loss in the amount of $1,695,-619.06 by reason of this flood upon its land. In 1956, the Commissioner of Internal Revenue disallowed the loss deduction claimed, and assessed deficiencies accordingly. Petitioner sought relief in the Tax Court, which held that petitioner was not entitled to deduct the alleged loss and confirmed the deficiencies asserted by the Commissioner.

This is a petition to review the Tax Court decision. 34 T.C. 539 (1960). The fundamental question presented is whether, as a result of the flood, the petitioner, J. G. Boswell Company, has sustained a loss within the meaning of Section 23(f) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(f), during the fiscal years ended June 30, 1952 and March 31, 1953.

Petitioner measures the claimed loss as being the alleged difference between the estimated fair market value of the land before the flood and the estimated value on June 30, 1952, when the floodwaters stood at their greatest depth on the land. The amounts claimed in petitioner's returns are either these alleged differences in value or the adjusted basis of the several parcels, whichever is the lesser amount. The injury causing the loss is alleged to consist of the following elements:

(1) Petitioner would lose the use of its lands for an indefinite period of time.

(2) The flood physically injured the petitioner's lands.

(3) The flood permanently added salts to the soil which would shorten its useful life for farming purposes.

(4) The "cotton history" of the land would be reduced since no cotton could be grown while the waters stood on the land.

The material facts found by the Tax Court may be summarized substantially as follows:

Petitioner, J. G. Boswell Company, is a California corporation, and is the successor by merger in 1957, of the Tulare Lake Land Company and the J. G. Boswell Company. The predecessor companies both owned land in the basin which was inundated by the flood. Because they had different fiscal years at the time of the flood, the loss deductions claimed appear in two separate tax periods. During the taxable years in question the petitioner was engaged in the operation of farms in Kings County, California, an area commonly known as the Tulare Lake Basin.

The basin is a reclaimed lake bed and is the natural repository for the waters of several mountain-snow run-off streams which flow into the basin.

Since the lowest natural outlet is nearly thirty feet above the floor of the basin, the flooding waters settle and in time sink into the soil, evaporate, or are removed by pumping. Thus it is not unusual for the water to remain many weeks before it is entirely removed, preventing the normal use of the land.

Approximately four feet below the surface is a hard clay pan which, for all practical purposes is impervious to water. As a result, the soil above the pan has accumulated a high content of salt deposits carried in by the successive floods and irrigation waters. This accumulated salt water rests directly on the pan, and is known as the "perched water table".

The uncontrolled presence of salt tends to inhibit and may even prevent the growth of crops. Successful farming is possible, however, through a combination of leaching and other farming techniques such as deep-plowing, mulching, and rotation of crops. (Leaching is the process of washing the salt deposits below the root zone by the proper application of irrigation waters.)

Although it was found that the flood waters which came on the land in 1952 contained on the average at least 200 pounds of salt per acre-foot of water, there was no evidence as to the salt content of the soil at the time of the flood or immediately after the lands had been de-watered.

The levees were breached in the spring of 1952, and about June 30, 1952, when the flood reached its crest, the land in question was covered with 12 to 15 feet of water. Pumping of the flood waters off one of the parcels was completed as early as February 23, 1953. By September 22, 1953, all of the remaining parcels had been pumped dry. The action of the flood waters caused breaks in the levees, washed the soil around, and deposited silt in the drainage and irrigation ditches. The land was left in an uneven and rough condition.

To rectify the damage done by the flood the petitioner was required to repair and level the land, rebuild the levees, and clean out the silt deposited in drainage and irrigation ditches. The costs of making such repairs were deducted on the petitioner's returns in the years incurred as ordinary and necessary business expenses. As soon as the land was de-watered and repaired, the soil was prepared for farming, crops were planted, and normal operation of the farms was resumed. The cost of this rehabilitation was also deducted by petitioner as ordinary and necessary business expense. Production on most of the land equaled or exceeded the pre-flood output.

The Tax Court found that the Federal Government had imposed cotton allotments or acreage limitations in 1950, and 1954, and the years following. In

1954, the limitation was imposed on a crop land basis, a system of computation which has no relationship to the number of acres previously planted to cotton. In 1950, and again in 1955, the limitation was imposed on a history basis, a system of computation which is based on the number of acres of cotton grown in the immediately preceding three years. Thus, in 1955, the petitioner's cotton allotment was restricted because of its lack of "cotton history" in the years of the flood. But in 1951, 1952, and 1953, during the tax years here involved, the government did not restrict the growing of cotton on petitioner's lands.

■■ In denying the petitioner's alleged loss the Tax Court correctly set forth the requirements for capital loss deduction under Section 23(f) of the Code as follows:

"* * * (1) There must be an actual loss; (2) the 'person' claiming the loss must sustain it; (3) the loss must be evidenced by a closed and completed transaction; (4) the loss must be fixed by an identifiable event; and (5) the loss must be sustained in the year claimed as a deduction."

These requirements are based on Regulation 111, § 29.23(e)-1 of the 1939 Code, which has been in effect for many years and has consistently required the elements listed above. Boehm v. Commissioner, 326 U.S. 287, 291, 66 S.Ct. 120, 90 L.Ed. 78 (1945). Although this regulation applies to losses by individuals, it is also applied to losses by corporations as provided by Regulation 111, § 29.23(f)-1. Since these regulations have been "long continued without substantial change, applying to unamended or substantially re-enacted statutes," they may be deemed to have received congressional approval and thus have the effect of law. Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52 (1938). The pertinent provisions of Regulation 118, which apply to the taxable years beginning after December 31, 1951, are substantially the same.

With regard to these requirements, the Tax Court correctly observed that the facts of this case do not require a consideration of items (2) and (4). The loss, if any, was clearly that of the petitioner. And, as noted below, the flood constituted an identifiable event fixing the *onset* of the alleged damage, if any. We shall, then, examine the elements of loss alleged by petitioner in light of the remaining requirements, items (1), (3), and (5).

Petitioner alleges as the first element of its loss the fact that, as of June 30, 1952, it would be unable to use the property for farming as long as it remained under water. This fact, it is contended, constituted an "absolute and final and non-recoverable and non-reversible" impairment to the value of the land which entitles petitioner to a capital loss deduction. In support of this contention petitioner cites a number of cases for the proposition that "the value of property is in the use to which it can be put." See United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1926); Stowers v. United States, 169 F.Supp. 246 (S.D.Miss.1958); United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1945); Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922).

We agree with the general proposition as cited from these authorities, but we think that the conclusions drawn therefrom by the petitioner in this case are not well founded. The value of this farm land is a reflection of its ability to produce income. If the property is standing under water, it is clear that the ability to produce income by growing cotton has been effectively interrupted. It is this impaired ability to produce income which petitioner cloaks in the phrase "impairment to the prospective use of the land" in order to take advantage of the language of the cases cited supra.

But calling the loss of potential income a loss of use of the property does not, in our view, serve to bring petitioner's case within the rule established by these au-

thorities. In each of those cases the impaired usefulness of the property was for all practical purposes permanent in nature. The finality of the lost use was enough to convince the courts in those cases that the transactions amounted to a loss of the property itself. In other words, the transaction had closed and the loss in value had in fact been realized.

In the instant case, however, the facts do not support such a conclusion. Here, the basin had a history of periodic flooding, in which normal farming operations were resumed shortly after the lands had been de-watered. That petitioner had the same expectation after this flood is shown by the fact that it bought a parcel of land in 1946, which was under water at the time of purchase, de-watered the land, and began to farm it the following year.

■ As of June 30, 1952, petitioner had not sold or otherwise disposed of his interest in the capital asset here involved. What then is the nature of the loss petitioner claims to have sustained? In our view, the substance of petitioner's claim is that it would be deprived of the income produced by its farms during the temporary presence of the flood waters on the land. The Tax Court found, and petitioner in fact admits, that the presence of the flood waters would be only temporary. Such a short term interruption in the use of the property is not in our view tantamount to a loss of the property itself.

That such a claim cannot be the basis for a Section 23(f) loss deduction is clearly established by Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941). In that case the Supreme Court set forth the rule that a loss of potential income is not a deductible loss within the meaning of the capital loss provisions. We think the rule of the Hort case to be controlling here, and we are not persuaded by petitioner's efforts to distinguish it from the instant case. The policy underlying the Hort rule may require its application in many fact situations. Where, as here, petitioner's claim amounts to nothing more than a temporary loss of potential income from the property, no loss deduction can be allowed.

■ Petitioner alleges as the second element of its loss the physical injury inflicted upon its land by the flooding water. The Tax Court, however, found that these injuries had been repaired and that the land had been rehabilitated for farming use. It found that the out-of-pocket costs incurred to make these repairs were deducted by petitioner as ordinary and necessary business expenses. These deductions were stipulated by the parties to have been properly deducted. By now claiming these expenses as a loss, petitioner seeks to reinforce its allegations as to the other, more speculative, elements of loss sustained. We agree with the Tax Court's conclusion that "petitioner's claim for the loss is not advanced by this contention." 34 T.C. 539, 545.

Petitioner argues further, however, that if we hold these expenses are now properly claimed as a loss, the Commissioner may invoke the relief provisions if such a decision were made. But the availability of this relief does not serve to support the merits of petitioner's claim that such expenses should now be regarded as capital loss.

■ Petitioner alleges as the third element of loss the addition of salts to the soil which, it is claimed, shortened the useful life of the land for farming purposes. The Tax Court found this contention to be without merit. We think that substantial evidence exists in the record to support this conclusion.

First, petitioner did not present any evidence to show the actual amount of salt added to the soil by the 1952 flood. The only evidence on this point shows an increase in the salt concentration on one particular parcel between the years 1948 and 1958. Such data provides the trier of fact with no reliable inference as to the salt increase brought about by the 1952 flood. As the Tax Court pointed out, other floods and irrigation waters, both before and after the 1952 flood have also added salt deposits to the soil.

Second, petitioner also contends that the salt deposits added by the 1952 flood constituted permanent damage to its land. This it is urged, is supported by the opinion below.

We think that a careful reading of the Tax Court's opinion indicates just the contrary. The court below concludes that increased salt deposits from the 1952 flood would not, per se, shorten the useful life of the land. 34 T.C. 539, 549.

In support of this conclusion the Tax Court relies upon the fact that modern farming techniques to control the salt content of the soil have been successfully used on the farms in this basin. In fact many areas formerly unuseable have been so treated by these methods and are now successfully farmed. Such techniques were used by the petitioner in this case to the end that the land was shortly returned to farming use and has produced as much or more than before the 1952 flood. We note that the costs incurred in rehabilitating the soil from these salt deposits are generally deductible as ordinary and necessary business expenses, and were so deducted by the petitioner after the 1952 flood.

On the basis of these facts the Tax Court concluded that a claim of permanent damage to the useful life of the land was too speculative to justify a capital loss deduction in the taxable years in question. We agree. Petitioner has received the benefit of a tax deduction for the out-of-pocket expenses incurred to return the land to productive use. The alleged capital loss was properly disallowed.

Petitioner alleges as the fourth element of loss the reduction in the "cotton history" caused by its inability to grow cotton while flood waters stood on the land. In our view this contention is also without merit. For the taxable years in question this claim is at best, speculative.

Petitioner's claim of loss rests on the assumption that the government will impose, in the years immediately after the flood, the same type of crop limitation as it has in the past. That this assumption cannot support a claim for a Section 23(f) loss deduction is made clear by the rule in Lucas v. American Code Company, 280 U.S. 445, 50 S.Ct. 202, 74 L. Ed. 538 (1929). That case requires that where the loss has not been realized by sale or other disposition, it must be "reasonably certain in fact and ascertainable in amount" to be deductible as a capital loss.

Neither of these tests is met in this case. The speculative nature of the claim is made clear by the fact that crop limitations on a "cotton history" basis were imposed in 1950 and not again until 1955. Also by the fact that the limitations imposed in 1954 had no relation to the history of cotton grown on the land. In other words, as of the taxable years in question, petitioner was not reasonably certain in fact, either when the growth of cotton would again be restricted or if the history of cotton grown would be a basis for that restriction. The year in which such controls were again imposed would also have an effect upon the amount of the loss to be claimed, a factor which petitioner failed to consider. Such speculation cannot, in our view, be the basis for a Section 23(f) capital loss deduction. In view of our determination of this claim we do not reach the question (not raised on brief) as to whether a "cotton history" is an element of property which can come within the capital loss provisions in a year when such a crop restriction is in fact imposed.

Having thus concluded that each of the elements of loss alleged by petitioner is not properly the basis of a Section 23(f) capital loss deduction, the deficiencies asserted by the Commissioner must be sustained.

The decision of the Tax Court is affirmed.