Central Arizona Ranching Company v. Commissioner. Farmers Investment Company v. Commissioner.
Central Arizona Ranching Co. v. Commissioner
Docket Nos. 76565, 76575.
United States Tax Court
T.C. Memo 1964-217; 1964 Tax Ct. Memo LEXIS 123; 23 T.C.M. (CCH) 1304; T.C.M. (RIA) 64217; August 17, 1964
*123 Held, Farmers Investment Company did not incur any loss within the meaning of section 23(f), I.R.C. of 1939, as a result of the flooding of its property in 1952. Held, further, petitioners are not entitled to amortization of the State land leases and/or Federal land leases held by them, since it was not established that such leases were of a limited duration which could be estimated with reasonable accuracy within the meaning of section 23(1), I.R.C. of 1939, and section 167, I.R.C. of 1954. Erwin Lampe, 886 S. Bronson Ave., Los Angeles, Calif., for the petitioners. Edward H. Boyle, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following deficiencies in petitioners' income tax: Petitioner
Docket No.
Year
Deficiency
Farmers Investment Company
76575
1952
$37,834.14
1953
15,470.29
1954
4,960.14
1955
8,343.70
Fiscal Year
Ended
Central Arizona Ranching Company
76565
2/28/55
$ 3,137.84
2/29/56
4,612.98 Farmers Investment Company claims an overpayment of its income tax in 1954 and 1955 in the respective amounts of $3,654.31 and $4,908.57. Central Arizona Ranching Company claims an overpayment of its income tax in the fiscal years ended February *124 28, 1955 and February 29, 1956 in the respective amounts of $1,115.91 and $1,485.70. The issues in these consolidated cases are (1) whether Farmers Investment Company is entitled to a loss deduction in 1952 due to flooding of its property, and (2) whether petitioners are entitled to amortize the cost of certain State and Federal leases and permits over the years here involved. Findings of Fact Some of the facts were stipulated and they are so found. It has also been stipulated in Docket No. 76575 (Farmers Investment Company) that "[for] purposes of background in this case the parties agreed that the Tax Court's findings of fact in the case of [J. G. Boswell Co., 34 T.C. 539, affd. 302 F. 2d 682] * * * shall be adopted as a part of the record in this case." Farmers Investment Company (hereinafter called Farmers) was organized under the laws of the State of California in 1947. Its principal office was at Tucson, Arizona, where all of its books and records are located. Farmers filed its corporation income tax returns for the years 1952 through 1955 with the district director of internal revenue, Los Angeles, California. Central Arizona Ranching Company (hereinafter called Central) *125 was incorporated in 1953 under the laws of the State of Arizona. Central is a wholly-owned subsidiary of Farmers. Central's principal office is in Tucson, Arizona. Central filed its corporation income tax returns for its fiscal years ended February 28, 1955 and February 29, 1956 with the district director of internal revenue, Phoenix, Arizona. Farmers is engaged in the business of farming, while the principal business activity of Central is owning real estate. In 1947 Farmers acquired 480 acres of land in the Tulare Lake Area in Reclamation District No. 749, Kings County, California. The property included a protective levee and in 1947 and 1948 Reclamation District No. 749 levee improvement charges were capitalized so that after 1948 Farmers' total basis in this property was $43,007.42. The Tulare Lake property was protected by levees from possible flooding from ordinary rain or a sudden increase in runoffs from the mountains. In June 1952 heavy rains and a heavy runoff from the mountains broke the levee covering the entire area with eight to nine feet of water and silt. By February 1953 the flooded area in District No. 749, including Farmers' property, had been drained. The costs *126 incurred by Farmers in repairing the broken levees and in draining the land were charged to expense. Farmers' property was again under cultivation in 1953 and in later years. After 1953 the property was capable of producing crops equal to those grown prior to the flood in 1952. Soil from Farmer's property was used in order to build up the levees after the 1952 flood. As a result, the size of the borrow pits [1] was increased, and there was a corresponding decrease in the acreage on Farmers' property that was available for farming. Prior to 1952 the acreage on Farmers' property that was available for farming was about 463 acres; subsequent to 1952 the tillable acreage was 446 acres. Farmers itself did not farm its Tulare Lake property but leased the property to others for farming purposes. The farm was planted entirely in barley from 1947 through 1951. From 1949 through 1952 the farm had been leased to R. A. Rowan and Company, which *127 also conducted farming operations on adjacent property. Farmers had no summer irrigation water supply essential to the growing of cotton. R. A. Rowan and Company obtained such a supply and, in 1952, planted about 150 acres of cotton on the Farmers' property. The cotton crop was destroyed by the 1952 flood. In 1953 R. A. Rowan and Company again leased the Farmers' property and in that year about 446 acres of the farm were planted in cotton. In the years 1954 through 1956 Farmers leased its Tulare Lake property to another lessee. In January 1957 R. A. Rowan and Company purchased the Tulare Lake property of approximately 480 acres from Farmers for $192,000. At that time the property had a cotton allotment of 99.7 acres. R. A. Rowan and Company then continued to plant this property in cotton and small grains. Cotton allotments, or limitations on acreage, were imposed by the Federal Government in 1950 and then again in 1954 and subsequent years. The allotment in 1954 was imposed on a "crop land" basis, which was a system of computation without any relationship to the number of acres previously planted in cotton. In 1955 the allotment was computed on a "history" basis, i.e., the allowance *128 was based on the number of acres in cotton in prior years. In 1950 Farmers purchased property near Eloy, Arizona for $581,649.61. The purchase price included a growing crop of cotton, wells, equipment, improvements, fee land, a long-term lease on fee land expiring February 1, 1954, and two long-term agriculatural leases from the State of Arizona expiring June 30, 1956 and June 30, 1957. The purchase price was allocated among the various assets, and the amounts allocated to the Arizona leases were as follows: $153,565.85 to the lease expiring June 30, 1956, and $13,607.10 to the lease expiring June 30, 1957. In April 1949 the area around Eloy, Arizona, including Farmers' fee and leasehold properties, had been declared a critical water area. After Farmers purchased the Eloy property in 1950, Farmers drilled six new wells to augment the water supply. The cotton allotment and the amount actually planted on the Eloy property in the years 1954 through 1959 were as follows: Acreage actually
Year
Cotton Allotment
planted
1954
1,908.7 acres
1,908.7 acres
1955
1,667.0 acres
1,629.9 acres
1956
1,595.9 acres
1,595.5 acres
1957
1,714.3 acres
1,200.0 acres *
1958
1,705.3 acres
1,705.3 acres
1959
1,506.3 acres
1,497.4 acres
*129 The State of Arizona leases expiring June 30, 1956 and June 30, 1957 were renewed for a 10-year period beginning July 31, 1956. The Eloy property, including these leases, was sold by Farmers in December 1961 for $1,142,690, and the said leases were transferred to the buyer after the written consent of the State Land Commissioner as required in the leases. In 1960 Farmers purchased a farm in Arizona identified as the Picacho property. This property, which was about 10 miles distant from the Eloy property, consisted of 1,440 acres of fee land and 160 acres in State of Arizona agricultural leases and carried a cotton allotment of 359.8 acres. The principal business activity of Central was owning real estate and its only income for its fiscal years 1955 and 1956 was rental income in the respective amounts of $30,000 and $45,000. In 1954 Central purchased four ranches near Wickenburg, Arizona. The purchase included 82,947 acres of State of Arizona land grazing leases capitalized at $151,937.11, 17,110 acres of Federal land grazing leases capitalized at $8,910 and 35,520 acres of Federal land grazing *130 permits capitalized at $10,004. On July 1, 1955 the State of Arizona land grazing leases were combined into one new 10-year grazing lease. Central acquired the State of Arizona grazing leases with the intention of locating water and then requesting the State of Arizona to reclassify the leases from grazing to agricultural. During the years before us Central was successful in having a portion of its State of Arizona acreage so reclassified. The lessee of a State of Arizona land lease, whether grazing or agricultural, has a preferred right to renew the lease at the end of the term, and when a grazing lease is reclassified as an agricultural lease, the lessee under the grazing lease has a preferential right to the new agricultural lease. The Federal government owns substantial land in the State of Arizona, and at times there are exchanges of parcels of land between the State and the Federal government. Over the past 10 or 15 years the major part of such exchanges have been made at the request of lessees holding State leases. When the State acquires land from the Federal government subject to permit or lease, the State grants to the former holder of the Federal permit or lease a preference *131 to continue leasing the same land. At times the Arizona State Land Department sells land at public auctions, and if the land is subject to a lease the lessee is entitled to remain on the property until the term of the lease expires. A buyer must pay the former lessee for the appraised value of any improvements. Generally, a lessee who has developed the land and placed improvements there is the successful bidder at the public auctions of State lands. The Taylor Grazing Act of June 28, 1934 is the basic legislative authority governing the management and protection of the vacant public lands of the United States. Federal licenses or permits under Section 3 of The Taylor Grazing Act are granted on the basis of the ownership of water or water rights. Section 3 of that Act, as amended to February 1, 1962, provides that permits shall be for a period of not more than 10 years. Federal leases under Section 15 of The Taylor Grazing Act are granted on the basis of ownership of contiguous lands, and they are issued for a period of not more than 10 years. A lessee or permittee who continues to own the base properties (water rights or contiguous lands) has a preference right to renew both Section *132 3 licenses or permits and Section 15 leases. Central had leases or permits under both Sections 3 and 15 of The Taylor Grazing Act. Central's Section 3 permits expired in 1963 and at the time of trial was operating on an annual license, although it had a preference right to renew its permits as long as it continued to own the base properties. Central's Section 15 leases were renewed in September 1963 for a 10-year period. In its income tax return for 1952 Farmers claimed a casualty loss of $43,007.42, its entire basis in the Tulare Lake property, as a result of the flood. Respondent disallowed the deduction in full on the ground that "it has not been established that any loss or damage was incurred or sustained." In its income tax returns for 1952 and 1953 Farmers claimed a deduction of $29,750.56 in each year as amortization of the cost of the State of Arizona land leases in connection with its Eloy, Arizona property. The amortization was computed on the basis of spreading the cost allocated to such State leases over the period from 1950 (the year in which Farmers purchased the Eloy property) to the expiration dates of such State leases, i.e., June 30, 1956 and June 30, 1957. In its *133 income tax returns for 1954 and 1955 Farmers claimed an amortization of the State land leases in the amount of $15,045.57 in each year, computed on the basis of a settlement reached with the Appellate Division with respect to the years 1950 and 1951. Respondent disallowed the amortization deductions claimed by Farmers in connection with its State of Arizona land leases in each of the years 1952 through 1955. Central computed amortization at the rate of 9 percent (approximately equivalent to a term of 11 years). In its corporation income tax return for its fiscal year ended February 28, 1955, Central claimed an amortization deduction of $9,316.45 on its State of Arizona land leases and $1,143.01 on its Federal land leases and permits. The amortization claimed for Central's fiscal year ended February 29, 1956 was $13,674.34 for its State of Arizona land leases and $1,702.26 for its Federal leases and permits. Respondent disallowed the amortization deductions claimed by Central in each of its fiscal years 1955 and 1956. Opinion The first issue is Farmer's claimed loss deduction under section 23(f), Internal Revenue Code of 1939. [2] *134 To support its claim for a loss deduction in 1952 of $43,007.42 (Farmers' entire basis in the flooded property), Farmers argues that the 1952 flood caused a reduction of 50 acres in cotton "history" for its Tulare Lake farm, and that "[this] restriction as to planting continued up to the time of the sale of the property in 1957 and reduced the sales price by at least $50,000.00 so that the injury was permanent as far as * * * [Farmers] is concerned." Farmers also makes some sort of an argument that after the flood it rebuilt the protective levees with soil from the farm and that, as a result, the usable acreage of the farm was reduced by about 17 acres, and that the loss of this farm acreage is a deductible loss resulting from the flood in 1952. [3]
In J. G. Boswell Co., 34 T.C. 539, *135 affd. 302 F. 2d 682, we denied a casualty loss deduction claimed by the taxpayer in 1952 for flood damage to farms in the same region here involved. It has been stipulated that the findings of fact in the Boswell case are to be adopted as a part of the record in this case. We are of the opinion that our decision in that case is also controlling here on petitioners' claim of loss deduction based on possible future reduction of cotton acreage. Farmers relies upon its loss of cotton "history" to support the loss claim of $43,007.42. But the taxpayer in the Boswell case also relied, unsuccessfuly, on the argument that a part of the permanent damage or injury caused by the flood was the reduction in its cotton "history." We held that, as of the end of 1952, any damage caused by a possible future diminution of cotton "history" was "at best speculative," and that consequently there was no loss in 1952 evidenced by a closed and completed transaction within the meaning of section 23(f) of the Internal Revenue Code of 1939. In its opinion affirming the Tax Court, the Court of Appeals for the Ninth Circuit stated, in part, as follows: The speculative nature of the claim is made clear by the *136 fact that crop limitations on a "cotton history" basis were imposed in 1950 and not again until 1955. Also by the fact that the limitations imposed in 1954 had no relation to the history of cotton grown on the land. In other words, as of the taxable years in question, petitioner was not reasonably certain in fact, either when the growth of cotton would again be restricted or if the history of cotton grown would be a basis for that restriction. The year in which such controls were again imposed would also have an effect upon the amount of the loss to be claimed, a factor which petitioner failed to consider. Such speculation cannot, in our view, be the basis for a Section 23(f) capital loss deduction. * * * Farmers attempt to distinguish the Boswell case by pointing out that the taxpayer in the Boswell case did not plant any cotton in 1952 on the flooded farms but that 150 acres of Farmers' land was actually planted in cotton which was later destroyed by the flood. Such a distinction is without any legal significance for the purpose of establishing a loss in 1952 under section 23(f) of the Internal Revenue Code of 1939. The essential fact is that, as of the end of 1952, it was pure speculation *137 that the Federal government would in some future year again impose a crop limitation on a cotton "history" basis. Nor is there any merit in Farmers' contention that, as a result of the 1952 flood, it was compelled to rebuild the protective levees with soil taken from its property, and that this caused a reduction of about 17 acres in farmable acreage which was a loss within the meaning of section 23(f) of the Internal Revenue Code of 1939. [4]
Farmers states that the loss of 17 acres of tillable land resulted from the flood because additional dirt was taken from the borrow pits in order to rebuild the levees. This evidence would not establish a loss resulting from the flood. The record indicates that such pits serve the purpose of catching surplus water, and their continued existence is necessary for the proper farming of the land. It thus appears that the borrow pits, as well as the rebuilt levees, are essential to the use of Farmers' land for productive purposes. They are in the nature of improvements *138 contributing to the value of the whole property. To establish a loss under section 23(f) of the Internal Revenue Code of 1939, Farmers must show that, as a result of the flood, it incurred damage or destruction of property. Citizens Bank of Weston, 28 T.C. 717, affd. 252 F. 2d 425. It is stipulated here that after 1953 when the flood waters were pumped off and the levees rebuilt "the property was capable of producing crops equal to those grown prior to the flood in 1952." The tillable acreage which Farmers claims to have lost was merely acreage used for an improvement to property which Farmers continued to own. [5]
We find, and so hold, that Farmers is not entitled to a loss deduction in any amount in 1952 within the meaning of section 23(f) of the Internal Revenue Code of 1939. The next issue is whether Farmers and Central are entitled to any amortization deductions in the years before us in connection with certain State of Arizona land leases (agricultural and grazing) and Federal grazing leases or permits. Farmers acquired two State agricultural leases in *139 1950 in connection with the Elroy, Arizona property and seeks to amortize the cost ($167,172.95) over the remaining term of the leases, i.e., June 30, 1956 and June 30, 1957. Central acquired State grazing leases and Federal grazing leases and permits in connection with its purchase of four ranches in 1954 near Wickenburg, Arizona. In 1955 the State grazing leases were combined into one new 10-year grazing lease. The Federal grazing lease (Section 15 of The Taylor Grazing Act) was for a period of 10 years from September 1953 and it was renewed for another 10-year period in 1963. The Federal grazing permit (Section 3 of The Taylor Grazing Act) was also for a 10-year period ending in 1963, and it appears that at the time of trial Central was operating under an annual license in connection with the land owned by the permit. Central amortized both its State and Federal leases and permits at the rate of 9 percent, or over a term of approximately 11 years. Section 23(1) of the Internal Revenue Code of 1939 and section 167 of the Internal Revenue Code of 1954 allow as a deduction a reasonable allowance for the exhaustion of property used in a taxpayer's trade or business. The regulations *140 under these sections (Regs. 118, sec. 39.23(1)-3 and sec. 1.167(a)-3, Income Tax Regs.) are substantially the same. Section 1.167(a)-3, Income Tax Regs., provides that "[if] an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance." We do not believe that the various leases, licenses and permits acquired by Farmers and Central under the State or Federal statutes are shown to be intangible assets useful "for only a limited period, the length of which can be estimated with reasonable accuracy." A paramount consideration is that, both under the State of Arizona and the Federal statutes, lessees with grazing or agricultural rights are granted preference rights of renewal. Sections 37-290 and 37-291 of the Arizona Revised Statutes explicitly give a lessee of State land a preferred right to renew the lease, even where the land is reclassified from grazing to agricultural use. [6] *142 *143 General rules and regulations under the State statute (Rules 15, 29 and 31) provide detailed *141 guidelines for allowing this preferred right of renewal. Louis Duncan, the Arizona State Land Commissioner, testified that to his knowledge no one had successfully taken away a lease from a State lessee who had met certain conditions and who desired to renew the lease. These conditions are generally within the control of the lessee, such as (a) he must be a resident of the State of Arizona, and (b) he must use the land for the purpose the lease was granted. Similarly, The Taylor Grazing Act and the grazing regulations for the National Land Reserve provide that licensees and permittees of Federal land are given preferred rights of renewal. Riley Foreman, Chief of the Division of Ranch and Forestry, Bureau of Land Management, United States Department of the Interior (for the State of Arizona), testified that as long as a lessee continued to own certain basic properties (water rights for permits or licenses under Section 3 of The Taylor Grazing Act or contiguous land for leases under Section 15) he had a preferred right of renewal. In V. P. Shufflebarger, 24 T.C. 980, we held that a taxpayer was not entitled to amortize under section 23(1) of the Internal Revenue Code of 1939 certain grazing permits issued by the Forest Service of the United States Department of Agriculture. Preference rights were given to holders *144 of such grazing permits, and we found that the life of a grazing preference was "not delimited by the term of the current grazing permit, but is of indefinite duration and continues until canceled or revoked." We also indicated that the "grounds for cancellation or revocation are wholly contingent and may never happen, and some are wholly within the control of the preference holder." We believe that case is controlling here, both as to the State of Arizona leases and the Federal leases, licenses and permits. The statutes and regulations involved, both Federal and State, and the experience evidence of the operation of these statutes and regulations indicate that the preference rights granted to Farmers and/or Central under the State and Federal statutes are of indefinite duration. Many of the arguments made here by the petitioners were fully answered in the Shufflebarger case. It cannot be said under this record that from general experience or other factors it is reasonably certain that either the State leases (grazing and agricultural) or the Federal leases, licenses or permits were of a limited duration which could be estimated with reasonable accuracy within the meaning of section 23(1) of the Internal Revenue Code of 1939 *145 and section 167 of the Internal Revenue Code of 1954. We find, and so hold, that Farmers is not entitled to an amortization deduction for its State of Arizona land leases during the years here involved, and that Central is not entitled to an amortization deduction for its State of Arizona land leases and Federal leases, licenses or permits during the years here involved. Decisions will be entered under Rule 50. Footnotes
1. Borrow pits are depressions in the land left after the removal of soil which is used to build up levees and irrigation ditches. Such pits serve the purpose of catching surplus water, whether from floods or irrigation, thereby keeping water off productive land.↩
*. 500 additional acres were diverted to soil bank, i.e., Farmers was paid for not planting.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(f) Losses by Corporations. - In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.↩
3. Farmers contends on brief that the measure of the 17-acre loss would be based on a fair market value of $400 per acre, or a total of $6,800, or in the alternative, would be limited to Farmers' basis of $93.08 per acre, or $1,582.↩
4. Farmers was allowed deductions for its expenditures incurred in rebuilding the levees, as well as its expenses for pumping off the flood waters, re-leveling, and repairing irrigation facilities.↩
5. Farmers sold its Tulare Lake property, which it had acquired in 1947 for a little more than $40,000, in 1957 for $192,000.↩
6. § 37-290. Cancellation of lease by reclassification of lands; preferred right to lease reclassified land; refund or advance rental payments A. Upon reclassification of state lands, whether upon application for reclassification or upon initiation by the commissioner, notice of the decision shall be served upon all interested parties of record in the department. If no appeal from the reclassification is taken as provided for by law, or if the decision of the commissioner is upheld on appeal, any lease upon the land reclassified shall be automatically cancelled, and the land offered for lease in the same manner as if it had not been previously leased. B. A lessee, or an applicant for renewal of a lease at the time of the notice of the reclassification shall have a preferred right to lease the reclassified land at the reappraised rental there-of for a term not longer than ten years as determined by the department. C. Upon cancellation of the lease of reclassified lands, if the land as reclassified is leased to a person other than the existing lessee or applicant for a renewal lease, the unused pro rata of an advance rental payment made by the existing lessee shall be refunded to such lessee, and the lessee shall be protected in improvements on the land owned by the lessee in the same manner as provided in § 37-293. § 37-291. Preferred rights to renewal of lease; exceptions A. Upon application to the state land department not less than thirty nor more than sixty days prior to the expiration of a lease of state lands, the lessee, if he is a bona fide resident of the state, shall have a preferred right to renewal, bearing even date with the expiration of the old lease, for a term not longer than ten years, as determined by the department, at a reappraised rental. B. The preferred right of renewal shall not extend to a lessee who has not substantially complied with the terms of his lease or who has not placed the land to the use prescribed in the lease during the term thereof or within the time prescribed therein, unless for good cause the failure to perform was given written authorization by the department. If the department determines the continued leasing of the land not in the best interest of the state, the lease shall not be renewed.