AUDREY M. THOMPSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1164-70, 1330-70, 1336-70, 3015-70.    Filed September 21, 1976.

---

[1] Cases of the following petitioners are consolidated herewith: Florence Ain and Gregory Ain, docket No. 1330-70; Dorothy E. Kahan and Robert Kahan, docket No. 1336-70; Nana Berman and William Berman, docket No. 3015-70. In addition, the parties in the following related cases have stipulated that the Court's decision in the four consolidated cases will be binding upon such parties with respect to the issues in such consolidated cases which are common to such related cases: Ruth Maietta and Salvatore Maietta, docket No. 1163-70; Marjorie Brock and Robert L. Brock, docket No. 1165-70; Sonia Morriss and Bentley Morriss, docket No. 1166-70; Zelda Kaplan and Victor E. Kaplan, docket No. 1167-70; Lee Edna Ford and John R. Ford, docket No. 1224-70; Leta N. Allee and Eddie L. Allee, docket No. 1329-70; Esther Carlin and Gene A. Carlin, docket No. 1331-70; Eugenie Magana and Raoul Magana, docket No. 1334-70; Margerie Goldberg and Jerome Goldberg, docket No. 1335-70; Norma M. Olney and Daniel C. Olney, docket No. 1337-70; Helen Weinstock and Ralph Weinstock, docket No. 1520-70; Mary Balaban and Leonard Balaban, docket No. 1521-70; Ruth Heldman and Morris J. Heldman, docket No. 1522-70; Hope Corey and Jeff Corey, docket No. 1525-70; Elizabeth J. Lovin and Bailey J. Lovin, Jr., docket No. 1526-70; Barbara N. Shaw and Robert L. Shaw, docket No. 1527-70; Evelyn Lusher and Bernard Lusher, docket No. 1528-70; Kathryn A. Soares and Robert J. Soares, docket No. 1529-70; Margaret E. Kennedy and Leonard J. Kennedy, docket No. 1530-70; Alan G. Mack, docket No. 1531-70; Anita Robinson and Seymour Robinson, docket No. 1532-70; Eleanor S. DeMatoff and Seymour J. DeMatoff, docket No. 1656-70; Toby Roselinsky and Harold Roselinsky, docket No. 1657-70; Marlene J. Gurdin and Michael M. Gurdin, docket No. 1658-70; Suzanne Stewart and Robert Stewart, docket No. 1709-70; F.P. Fisher, docket No. 1735-70; Marie Levy and Mitchell Levy, docket No. 1755-70; Barbara Rafferty and John H. Rafferty, docket No. 1759-70; Marjorie Sievers and Jerome J. Sievers, docket No. 1763-70; Rena Gettelman and Eugene Gettelman, docket No.

1766-70; Michael (Williams) Schwartz, docket No. 1781-70; Norman Pitt, Individually and as Executor of the Estate of Eleanor Pitt, Deceased, docket No. 1782-70; Elizabeth Harrington and Marvin Harrington, docket No. 1783-70; Bernice Dimitman and Merlin Dimitman, docket No. 1796-70; Annette Marcus and Philip M. Marcus, docket No. 1797-70; Mamie Joe and Walter Joe, docket No. 2843-70; Leah London and Milton London, docket No. 2844-70; Martha Shell and Albert Shell, docket No. 3014-70; Delores M. Lusk and Robert W. Lusk, docket No. 3332-70; Estate of Milton Rosenthal, Deceased, Elaine B. Fischel, Executrix, docket No. 4182-70; Ruth Ann Lewis and Sheldon P. Lewis, docket No. 4364-70; Melita Forsberg and Robert Forsberg, docket No. 4588-70; Marguerite A. Gilbert and William B. Gilbert, docket No. 4589-70; Jane M. Schmidt and Harry M. Schmidt, docket No. 4612-70; Marilyn M. Diekmann and Edward F. Diekmann, docket No. 4613-70.

*Harry Margolis,* for the petitioners.
*Sheldon M. Sisson,* for the respondent.

DAWSON, *Chief Judge:** Respondent determined deficiencies in the income tax of petitioners in these consolidated cases as follows:

| Docket No. | Petitioners | 1965 | Taxable year 1966 | 1967 |
|---|---|---|---|---|
| 1164-70 | Audrey M. Thompson | $7,018.41 | $4,725.00 | --- |
| 1330-70 | Florence Ain and Gregory Ain | 1,334.28 | 1,507.20 | --- |
| 1336-70 | Dorothy E. Kahan and Robert Kahan | 5,881.19 | 5,332.76 | --- |
| 3015-70 | Nana Berman and William Berman | 3,394.51 | 3,481.40 | $6,802.21 |

The four consolidated cases, as well as the related cases referred to in footnote 1, are all concerned with a series of transactions during the years 1965 through 1967, involving Del Cerro Associates (a limited partnership) and Douglas R. McAvoy Organization (a California corporation). All of the petitioners in these cases were either partners in Del Cerro Associates or stockholders of Douglas R. McAvoy Organization, or both, during the

---

* Pursuant to a notice of reassignment sent to counsel for the parties and to which no objections were filed, this case was reassigned from Judge Austin Hoyt to Chief Judge Howard A. Dawson, Jr., for disposition.

years in question. In order to facilitate trial, briefing, and decision, the parties have designated each of the four consolidated cases, respectively, as representative of one of the four issues to be decided, and have stipulated that our disposition of the designated issues in each case will be binding in all of the related cases involving such common issues.

The issues presented for decision are as follows:

(1) *Kahan.*—Whether a payment of $350,000 by Del Cerro Associates to Sunset International Petroleum Corp. in 1965 represented deductible prepaid interest or was in substance a loan to Sunset.

(2) *Ain.*—Whether amounts deducted by petitioners in 1965 as purported interest on personal promissory notes, given in payment for the purchase of stock, should be disallowed because the transactions giving rise to such notes were not bona fide.

(3) *Thompson.*—Whether certain amounts paid by Del Cerro Associates in 1966 are properly deductible as interest.

(4) *Berman.*—Whether Del Cerro Associates is entitled to a deduction in its 1967 return for a writeoff of a purported intangible asset designated as "Contractual Rights and Interests."

FINDINGS OF FACT

*Dorothy E. Kahan and Robert Kahan*
*(Del Cerro Associates—1965)*

Most of the facts have been stipulated, and such stipulated facts are found accordingly. Petitioners are husband and wife, residing in Los Angeles, Calif. They filed their income tax returns for 1965 and 1966 with the District Director of Internal Revenue in Los Angeles.

Robert Kahan is a certified public accountant engaged in a public accounting practice with a partner, Seymour DeMatoff, in Los Angeles, Calif. This practice serves approximately 300 individuals and 100 legal entities. In addition, Kahan has a small specialized accounting practice which he has conducted for approximately 25 years. During such period Kahan also engaged in the organization and promotion of various real estate and business ventures.

In 1965, Kahan began discussing various possible real estate transactions with Richard L. Weiss, vice president of Sunset

International Petroleum Corp. (Sunset). Sunset was a publicly owned corporation, headquartered in California, with more than 10,000 stockholders in 1965. Although it also engaged in the production of petroleum, its principal business activity during 1965 was real estate development. One of the major parcels of land held by Sunset was approximately 4,000 acres, located in San Diego, Calif., and known as Del Cerro. This property was being developed by Sunset for homes, shopping centers, gas stations, office buildings, and a wide range of other improvements.

In the course of his discussions with Weiss, Kahan learned that Sunset was anxious to generate gains from real estate sales prior to the end of its fiscal year, August 31, 1965; however, it wanted to do so in a way in which it could retain a continuing interest in the future development of any undeveloped land sold. Any such gains would be offset for tax purposes by net operating loss carryforwards and deductions for depletion and intangible drilling costs relating to Sunset's petroleum business. Essentially, Sunset was seeking a way to generate sales and profits for financial reporting purposes, but to retain control over, and a financial interest in, the property sold. At the same time Kahan was seeking real estate investment and tax shelter opportunities for various of his clients.

One of the parcels discussed by Weiss and Kahan was a 112-acre section (known as Del Cerro Units 5 and 6) of Sunset's Del Cerro property in San Diego. Kahan spoke to several of his clients concerning the parcel, and on August 26, 1965, a partnership, known as Del Cerro Associates, was organized to acquire the 112-acre parcel (hereinafter referred to as the San Diego property). The partnership consisted of Kahan and 18 other individuals, 15 of whom were clients of Kahan. One of the general partners was Ben Margolis, a lawyer and a close personal friend of Kahan. On August 28, 1965, 3 days before the end of Sunset's fiscal year, a letter agreement was signed, providing for the conveyance of the San Diego property.[2]

---

[2] The original letter agreement was between Sunset and North American Financial Corp., a corporation managed by certain business affiliates of Kahan (in which none of the Del Cerro Associates partners had any ownership interest); however, North American Financial Corp. had assigned all of its rights and obligations under the agreement to Del Cerro Associates prior to its execution. Since the temporary interposition of North American Financial Corp. as the original party to the Sunset agreement is not material to the issues in this case, the Sunset agreement will hereinafter be treated as if it ran directly between Sunset and Del Cerro Associates.

The agreement provided for the sale of the San Diego property by Sunset for a total price of $1,456,000 to be paid by the delivery of two promissory notes, one in the amount of $200,000 and the other in the amount of $1,256,000, both payable in full on September 1, 1978. Both notes were to provide for interest at the rate of 6 percent per annum, payable monthly. The $200,000 note was to be unsecured and the $1,256,000 note was to be secured by a second mortgage on the property being conveyed. The agreement also contained other material provisions, which may be summarized as follows:

(1) The buyer was given the option to prepay at closing the first 4 years' interest on the two notes, amounting to $349,440. If such option were elected, all interest accruing after the fourth year would be deferred and payable only upon maturity of the notes.

(2) The property sold was subject to an existing first mortgage covering a large tract of land owned by Sunset, from which the subject parcel was carved out for sale. The portion of the blanket mortgage allocable to the 112 acres sold was $360,000. Sunset was specifically granted the right to continue the first mortgage on the property (or to replace it with another first mortgage no greater than $360,000), until August 1, 1968. Sunset was obligated to make all payments with respect to, and to maintain free of default, any such first mortgage, and to pay in full any remaining balance on or before August 1, 1978, 1 month before the maturity date of the buyer's notes.

The transaction closed on August 31, 1965, at which time Kahan, acting for Del Cerro Associates, delivered to Sunset checks totaling $350,000, representing prepayment of 4 years' interest on the purchase-money notes, in exercise of the interest prepayment option contained in the letter agreement, as described above.[3]

---

[3] The difference between the $350,000 paid and the $349,440 required, as specified in the agreement, is not explained in the record.

The purchase-money notes, totaling $1,456,000, delivered to Sunset at closing were executed by North American Financial Corp. (North American), see n. 2 *supra,* and the deed of the property from Sunset was in favor of North American. However, the North American notes were guaranteed (in separate guarantee documents) by all of the Del Cerro Associates partners, and on Sept. 30, 1965, the property was deeded over by North American to Del Cerro Associates. (The original North American notes were further guaranteed in favor of Sunset by North American's parent corporation, Universal Decoration Leasing Co., on Sept. 30, 1965.)

On September 28, 1965, Del Cerro Associates entered into an agency agreement with Lion Realty Corp. (Lion), a licensed real estate broker and a subsidiary of Sunset, in which Lion was appointed as its sole and exclusive agent with respect to the San Diego property. This agreement contained, inter alia, the following provisions:

3. AUTHORITY OF AGENT

Lion shall have the full power and authority to do the following:

3.1  To improve the Property or cause the same to be improved and in connection therewith to pay for such improvements provided that the principal amount of such loans and advances shall not exceed One Million Dollars ($1,000,000.00) without the prior written approval of Del Cerro. The right of Lion to improve the Property shall be subject to the following:

3.1.1  Lion shall not cause the Property to be subdivided without the prior written consent of Del Cerro.

3.1.2  Lion shall be entitled to receive six per cent (6%) interest compounded annually on all funds advanced by Lion for the maintenance, improvement and development of the Property, which sums shall be paid to Lion upon the sale of the Property by Del Cerro provided only that Lion shall be paid either interest or principal from sale proceeds only and Del Cerro shall have no personal liability for any such items at any time and all Lion's rights to reimbursement shall cease upon the sale of the Property.

3.2  Lion shall have the sole and exclusive right to sell the Property prior to the date of the termination of this agency at public sale. The right of Lion to sell the Property hereunder shall be subject to the following:

3.2.1  The Property shall all be sold as one unit.

3.2.2  The sale shall be only for cash.

3.2.3  The amount realized from such sale shall not be less than $2,250,000.00. Provided such minimum sum shall be paid to Del Cerro as the first distribution of sale proceeds, Del Cerro does hereby agree to deliver the Property to the purchaser free and clear. The remaining proceeds of such sale shall be divided as follows:

(a) To Lion, until Lion shall have received an amount equal to all funds advanced or caused to be advanced by it under this Agreement, with interest thereon as herein provided; plus commission in amount equal to twenty per cent (20%) of the gross sales price.

(b) All sums remaining shall be paid to Del Cerro.

3.2.4  Del Cerro shall execute any and all deeds and/or other documents that may be necessary to consummate the sale of the Property in accordance with this Article 3.

4. CONSIDERATION FOR AGENCY

As the consideration for the granting of the agency hereunder, Lion shall pay all taxes, assessments and charges of every kind on the Property from September 1, 1965, up to and including the date the Property is sold or this agency terminates so that Del Cerro shall not be required to advance any sums of any kind hereunder until the property is sold hereunder.

* * *

6. LION ADVANCES

No sum advanced by Lion shall be recoverable by Lion except through sale of the property hereunder and then only to the extent that such advances can be repaid from the sale price. Any deficiency shall be lost forever by Lion.

The agreement was terminable prior to sale of the property only by mutual agreement of the parties, default by Lion on any of its obligations, or Lion's bankruptcy, insolvency, or assignment for the benefit of creditors. Neither party could assign its rights without the consent of the other. The agreement was eventually terminated by mutual agreement of the parties as of November 21, 1966.

Del Cerro Associates filed a partnership income tax return for the calendar year 1965, claiming a loss of $350,000. The loss was composed of:

| | |
|---|---|
| 1. Prepaid interest on notes for $1,456,000 _____ | $349,450 |
| 2. Other deductions (unidentified) _____ | 550 |
| Total_____ | 350,000 |

The following table sets forth the names of the Del Cerro Associates partners as of December 31, 1965, and the capital contribution (and allocable share of the claimed partnership loss) of each partner:

| Partner | Capital contribution (share of loss) | Partner | Capital contribution (share of loss) |
|---|---|---|---|
| Robert L. Brock | $15,000 | Milton London | $10,000 |
| Jeff Corey | 25,000 | Salvatore Maietta | 25,000 |
| Edward Diekmann | 6,250 | Margolis and McTernan | 70,000 |
| Robin Drews | 5,000 | Bentley Morriss | 25,000 |
| Robert Forsberg | 6,250 | Norman Pitt | 15,000 |
| Eugene Gettelman | 25,000 | Harry Schmidt | 6,250 |
| William Gilbert | 6,250 | Jerome Sievers | 25,000 |
| Marvin Harrington | 25,000 | Audrey Thompson | 15,000 |
| Robert Kahan | 20,000 | | |
| Victor Kaplan | 25,000 | | 350,000 |

At least 11 of the partners listed provided their capital contributions with funds borrowed specifically for that purpose.[4]

Respondent disallowed the partnership's claimed loss, and, accordingly, disallowed the deductions claimed by the various partners, including petitioner Kahan, for their allocable shares of such loss.

---

[4] At least four of the partners utilized personal funds. The source of the funds contributed by the remaining partners, who are not petitioners in these related cases, is not determinable from the record.

*Florence Ain and Gregory Ain*
*(Douglas R. McAvoy Organization—1965)*

Most of the facts have been stipulated and such stipulated facts are found accordingly. Petitioners are husband and wife, residing in Hollywood, Calif. They filed their income tax returns for 1965 and 1966 with the District Director of Internal Revenue, Los Angeles.

Harry Margolis is an attorney specializing in the field of taxation. He is the brother of Ben Margolis, one of the general partners of Del Cerro Associates. He has at various times acted for or dealt with, in a professional capacity, all of the petitioners in these related cases.

Dr. A.A.G. Smeets (a notary) and Dr. W.M.J. Alvares Correa (an attorney) were, during the years at issue herein, well-known business and professional figures in the Netherlands Antilles. Together, they headed an organization (referred to hereinafter as the Smeets-Correa organization) of numerous entities, some of which were engaged in the business of providing trustee and corporate management services to trusts and corporations established in the Netherlands Antilles and the Bahamas. Corporate management services were provided for a fee and included all services necessary for the operation of a corporate business, including office or warehouse space, employees, accounting, administration, and legal services. The Smeets-Correa organization was in 1960 believed to be the largest company-management organization of its type in the world, representing some 800 organizations, including more than 60 firms listed on the New York Stock Exchange. In addition, both Smeets and Correa have extensive personal financial interests in banking and other industrial and commercial enterprises.

During 1963 the Smeets-Correa organization formed a trust company in the Bahamas, known as Aruba Bonaire Curaçao Trust Co. Ltd., (ABC), which was beneficially owned (through another corporation) by Correa. Until the spring of 1965 ABC (which was not itself engaged in banking activities) was locally managed by, and shared office space in Nassau with, a Bahamian bank; it had no direct employees in Nassau. Subsequently, ABC acquired its own Nassau employees (six at time of trial) and office space (2400 square feet at time of trial); however, its principal officers and directors have at all times been part of the Smeets-

Correa organization and located in Curaçao, Netherlands Antilles.

During 1963 Harry Margolis and/or associates of his represented approximately 16 clients in the establishment of trusts at several banks in the Bahamas. These 16 trusts were all eventually placed with ABC. Subsequent to 1963, additional trusts were established at ABC by clients of Harry Margolis, and at the time of trial herein, Harry Margolis represented over 150 such settlors. Several of the petitioners in these related cases have interests as settlor or beneficiary of such trusts; however, none of such petitioners has any ownership interest directly or indirectly in ABC.

On or about June 15, 1965, ABC purchased, for $750, all of the outstanding stock of an inactive California corporation named Douglas R. McAvoy Organization (referred to hereinafter as McAvoy). McAvoy was acquired by ABC solely as a corporate shell for use in the transactions described below. During August 1965, ABC contributed $650,000 in cash to the capital of McAvoy. The funds used by ABC for this purpose were obtained from a trust which did not involve any of the petitioners in these cases.[5]

On or about August 31, 1965, McAvoy entered into a series of agreements with Sunset concerning two commercial and multiresidential parcels of 11.9 and 8.25 acres, respectively, in a larger tract owned by Sunset, north of Los Angeles, known as Thousand Oaks. These agreements consisted essentially of the following:

*Agreement of Sale.*—McAvoy agreed to purchase the two parcels from Sunset at a price of $700,000, subject to later adjustment to bring the price into line with property values as of July 1, 1967, as determined by independent appraisal. The purchase price was to be paid by a promissory note in the amount of $700,000, secured by a mortgage on the subject property, and payable in full on September 1, 1975. The note was to bear interest at 10 percent per annum. The first 4 years' interest, or $280,000, was to be paid in advance, upon closing, with interest after the fourth year to be accrued and paid upon maturity of the note. The property being sold was part of a larger tract which was subject to an existing first mortgage. The 11.9-acre

---

[5] It appears, although not entirely clear from the record, that ABC's involvement in these transactions was as a trustee or agent, and not for its own account.

commercial parcel could be released from such mortgage for $383,180 and the 8.25-acre multiresidential parcel could be released for $166,030.

*Agreement for Improvement of Land.*—McAvoy, as the new owner of the Thousand Oaks property, contracted to retain Sunset to arrange financing for, and to construct "all site and structural improvements" necessary to develop, a shopping center at a cost of not less than $2 million and apartment buildings (at least 140 units) at a cost of not less than $1 million. Construction was required to commence by July 1, 1967, and to be completed by June 30, 1970. Sunset was to prepare development plans to be submitted to McAvoy for approval. Sunset was to obtain all interim and permanent financing, for which it was to receive a fee from McAvoy in the amount of $370,000, payable in advance at the time of execution of the agreement. (McAvoy was responsible for all interest on financing arranged by Sunset.) Sunset was also to be paid a contractor's fee equal to 4 percent of all direct construction costs.

*Joint Venture Agreement and Indenture of Lease.*—In these two separate but related documents, McAvoy and Sunset entered into a joint venture, which joint venture leased the Thousand Oaks property from McAvoy for the purpose of "operating and managing" the property. As "rent" payable by the joint venture to McAvoy under the indenture of lease, the joint venture was obligated, for the 10-year term of the lease, to: (1) Assume and pay all financing costs incurred by McAvoy; (2) make interest-free loans to McAvoy to the extent necessary to pay for improvements to the property (or to make principal payments on the financing of such improvements). The lease was a "net lease," in which the joint venture was to pay all "impositions, costs, insurance premiums, and expenses and obligations of every kind and nature" relating to the Thousand Oaks property.

The lease also granted the joint venture an "option" to purchase the leased property on or before August 1, 1975. The option price, payable in cash, was $1,360,000, plus assumption or payment of then-existing mortgages, if exercised during 1970 or 1971; $1,480,000, plus assumption or payment of then-existing mortgages, if exercised during 1972 or 1973; $1,600,000, plus assumption or payment of then-existing mortgages, if exercised

during 1974 or thereafter.[6] In order to maintain this option, the joint venture was obligated to pay to McAvoy the sum of $30,000 semiannually, beginning December 1, 1965. Failure to make any such payment would result in termination of the option. All such payments made would be applied against the option price in the event of exercise.

The joint venture agreement provided for a term of 10 years, ending September 1, 1975 (or upon resale of the property, if earlier). It also provided that the purchase option contained in the indenture of lease would be exercised by the joint venture (without specifying the exercise date), and that Sunset was required to provide all of the funds required to exercise the option, as well as to maintain the option until exercised ($30,000 semiannually). Sunset was also required to loan to the joint venture all moneys required to be paid as "rent" under the lease, as described above, or required by the joint venture for any other purpose. Sunset was required to "bear all losses" and to recover any such losses only from profits. Sunset was granted broad exclusive power to "manage, develop, improve, control, operate, maintain and sell" the joint venture's leasehold interest in the property. Any net cash receipts of the joint venture from operation or sale of the property would be applied first to repay all loans and advances made to the joint venture by Sunset (or by McAvoy, if any), and any remaining balance would be divided equally between Sunset and McAvoy.

The $280,000 "prepaid interest" referred to in the agreement of sale (and related purchase-money note), and the $370,000 fee for obtaining financing, referred to in the agreement for improvement of land, were both paid by McAvoy to Sunset in cash at the time of closing of the above agreements on or about August 31, 1965. Both of these amounts were capitalized on the books of McAvoy, which computed its income on the accrual method. The prepaid interest was amortized on a monthly basis over a 4-year term; the prepaid financing fee was not amortized.

As security for Sunset's obligations and guaranties under the joint venture agreement (including its obligation to provide funds to maintain and exercise the joint venture's option to purchase the property), the parties entered into a pledge agreement, dated September 1965, whereby Sunset pledged to McAvoy all of the

---

[6] The indenture of lease does not set forth an exercise price for the period prior to 1970.

right, title, and interest in the two promissory notes, totaling $1,456,000, which Sunset had received in connection with the sale of the San Diego property to Del Cerro Associates, as described in our findings of fact in Kahan, *supra.* As a further means of securing the rights of the parties, the title to the Thousand Oaks property was deeded to a title company under the terms of a holding agreement, providing for the conveyance by the title company to the joint venture upon exercise of its purchase option or reconveyance of title to McAvoy should the option lapse.

In October and November of 1965, ABC, which then owned 100 percent of the outstanding stock of McAvoy, sold 98.583 percent of such stock to approximately 30 individuals (hereinafter sometimes referred to as the McAvoy investors) at an aggregate sale price of $6,800,000.[7] Many of these individual investors were clients of Kahan and/or Harry Margolis, and entered the transaction on their advice. Each individual purchaser signed an unsecured promissory note in favor of ABC in the full amount of the purchase price for his portion of the stock acquired. All of such notes provided for interest at the rate of 10 percent per annum, with 10-percent interest "to be paid absolutely and in any event on or before December 31, 1965." No payments on principal were due until maturity, August 1, 1972.

On December 6, 1965, ABC assigned all of the notes of the McAvoy investors to World Minerals, N.V. (World Minerals), a Netherlands Antilles corporation.[8] On or before December 31, 1965, the McAvoy investors paid a total of $475,000 to World Minerals, purportedly as interest on the aforementioned $6,800,000 of promissory notes.[9] The following table lists the names of each of the McAvoy investors and the amount paid (and deducted as interest) by each:

---

[7] The use of the words "sold," "sale," etc., in our findings of fact is for narrative convenience, following the form of the transactions, and is not intended as factual conclusions concerning the true nature of the transactions which are in question.

[8] No consideration was paid by World Minerals to ABC at the time of this assignment in 1965. Cash payments were made from World Minerals to ABC in subsequent years in connection with the assigned notes; however, the total amount paid is not determinable from the record.

[9] Although it appears that a total of $680,000 (10 percent of $6,800,000) was required to be paid by Dec. 31, 1965, the parties have stipulated that a total of $475,000 was claimed as interest payments in 1965 by the McAvoy investors. The reason for the difference is not determinable from the record.

| Investor | Amount paid | Investor | Amount paid |
|---|---|---|---|
| John Ford | $15,000 | Harold Roselinsky | $10,000 |
| Eddie Allee | 10,000 | Michael Gurdin | 40,000 |
| Florence Ain | 5,000 | Robert Stewart | 20,000 |
| Jerome Goldberg | 30,000 | F.P. Fisher | 15,000 |
| Ralph Weinstock | 15,000 | Mitchell Levy | 25,000 |
| Leonard Balaban | 10,000 | John Rafferty | 25,000 |
| Morris J. Heldman | 5,000 | Michael Schwartz | 10,000 |
| Bailey J. Lovin, Jr. | 10,000 | Merlin Dimitman | 10,000 |
| Robert L. Shaw | 20,000 | Walter Joe | 15,000 |
| Bernard Lusher | 15,000 | Albert Shell | 15,000 |
| Robert Soares | 20,000 | William Berman | 10,000 |
| Leonard Kennedy | 40,000 | Robert Lusk | 20,000 |
| Alan Mack | 10,000 | Milton Rosenthal | 20,000 |
| Seymour Robinson | 15,000 | Sheldon Lewis | 10,000 |
| Seymour DeMatoff | 10,000 | | |

The deduction of the foregoing amounts as interest in the 1965 personal income tax returns of each of the taxpayers listed, including petitioner Ain, was disallowed by respondent, and it is this disallowance which is at issue in the Ain case.

All but five of the above-listed investors made the indicated payments with funds borrowed for that purpose from Universal Decoration Leasing Co. Of the remaining five, four utilized personal funds and one borrowed the funds from Robert Kahan. Universal Decoration Leasing Co. (UDL) was a California corporation, incorporated July 1, 1964, all of the outstanding stock of which was owned by Associated Arts, N.V., a Netherlands Antilles corporation. None of the petitioners in any of these related cases had at any time any direct or indirect ownership interest of any kind in UDL or Associated Arts, N.V.[10] Harry Margolis at various times acted for or dealt with, in a professional capacity, both of these entities and served as counsel to UDL.

### Audrey M. Thompson
### (Del Cerro Associates—1965)

Most of the facts have been stipulated and such stipulated facts are found accordingly. Petitioner resides in Hollywood, Calif. She filed income tax returns for 1965 and 1966 with the District Director of Internal Revenue, Los Angeles.

---

[10] The record is conspicuously silent as to the beneficial ownership and operating control of Associated Arts, N.V., except for a stipulation that World Minerals "at one time" owned 50 percent of the stock of Associated Arts, N.V.

During 1966 the interests of the original 18 Del Cerro Associates partners in the San Diego property and the interests of the 30 McAvoy investors in the Thousand Oaks property were combined into a single new partnership which continued the name Del Cerro Associates (sometimes referred to hereinafter as Del Cerro 1966). McAvoy was dissolved by Del Cerro 1966 and its 30 individual stockholders became partners of Del Cerro 1966;[11] its interest in the Thousand Oaks property and the several agreements relating thereto were transferred to the partnership.[12] In connection with this reorganization, the following facts are of significance in these cases:

(1) Six new investors, who had not previously been affiliated with either Del Cerro Associates or McAvoy, became partners in the new combined partnership.

(2) Arrangements were made with World Minerals, the holder of an aggregate of $6,800,000 in promissory notes of the individual McAvoy investors (see our findings of fact in Ain, *supra*), for the cancellation of these individual notes and the assumption of the $6,800,000 aggregate obligation by Del Cerro 1966.

(3) The prepaid loan commitment fee in the amount of $370,000 and prepaid interest in the amount of $245,000 (net of amortization) which had been carried as assets (arising from the Sunset transactions described in Ain, *supra*) on the books of McAvoy prior to its liquidation, were carried forward onto the books of Del Cerro 1966.

(4) The investment in the Thousand Oaks property, subject to the various contractual arrangements with Sunset, which was included in the assets of McAvoy at no more than $715,000 at the beginning of 1966,[13] was, in effect, written up on the books of Del Cerro 1966 by the introduction of a new asset described (in the Del Cerro 1966 partnership tax return for 1966) as "Contractual Rights and Interests" in the amount of $6,254,500.

The 54 Del Cerro 1966 partners contributed an aggregate of $1,065,000 additional cash to the partnership in 1966. Most of

---

[11] The disposition of the 1.417 percent of the McAvoy stock which was not sold by ABC to the McAvoy investors in 1965 (see our findings of fact in Ain, *supra*) is not determinable from the record.

[12] Certain other assets of McAvoy were sold to unrelated parties.

[13] The balance sheet for the beginning of 1966, contained in the 1966 final income tax return of McAvoy, reflects "Land" in the amount of $715,000. Although this figure is not broken down, it presumably includes the Thousand Oaks property, acquired in 1965 for $700,000, plus one or two other parcels owned by McAvoy at the time of its liquidation.

these capital contributions were made with funds borrowed for that purpose from either Universal Decoration Leasing Co. (UDL),[14] Anglo Dutch Capital Co., North American Financial Corp., or the Greater West Co.[15]

Anglo Dutch Capital Co. (Anglo Dutch) is a California corporation which is owned 50 percent by Harry Margolis and 50 percent by Walter Joe, one of the Del Cerro Associates partners and a certified public accountant associated with Harry Margolis professionally. Several of the petitioners, including Walter Joe, have borrowed money from Anglo Dutch from time to time, although none, other than Walter Joe, has any direct or indirect ownership interest in Anglo Dutch.

North American Financial Corp. (NAFCO) is a California corporation which was inactive until acquired by UDL as a wholly owned subsidiary on July 1, 1964. NAFCO was then activated to engage in the loan servicing and real estate business. None of the petitioners in these consolidated cases had at any time any direct or indirect ownership interest in NAFCO. However, there was a close working relationship between Harry Margolis in a professional capacity, NAFCO, and UDL.

The Greater West Co. (Greater West) was a California corporation actively engaged in real estate development until it was dissolved in 1967. It was wholly owned by T.C. McMillan until sold by him to ABC on December 15, 1965, in a transaction involving the McMillan family trusts. On December 13, 1966, ABC loaned Greater West $400,000. None of the petitioners in these consolidated cases had at any time any direct or indirect ownership interest in Greater West. However, Harry Margolis has at various times acted for or dealt with Greater West in a professional capacity.

In its partnership tax return for 1966, Del Cerro 1966 claimed an interest deduction in the total amount of $1,070,000. This amount consisted of (1) $825,000 paid to World Minerals as interest (some portion being a prepayment) on the $6,800,000 obligation assumed from the former McAvoy investors, and (2) $245,000 representing a complete writeoff of the prepaid interest account taken over by Del Cerro 1966 from the books of McAvoy

---

[14] See our findings of fact in Ain, *supra,* for information concerning Universal Decoration Leasing Co.

[15] It has been stipulated by the parties that all loans from UDL, North American Financial Corp., and the Greater West Co. were repaid with interest. Such stipulation is silent as to loans from Anglo Dutch Capital Co.

at the time of the liquidation of McAvoy into the partnership. The partnership reported a net loss of $1,071,635.08 for 1966. This consisted principally of the aforementioned interest deductions, plus miscellaneous other deductions (in excess of a small amount of rent income). The following table sets forth the name, 1966 capital contributions, and allocable share of partnership net loss of each of the partners of Del Cerro 1966, as reported in its tax return. The table also identifies the several partners whose capital contributions were provided through loans from the entities discussed above:

| Partners | Contributions | Source of funds for contributions | Loss |
|---|---|---|---|
| Margolis & McTernan | $70,000 | | $70,427.86 |
| Ain | 5,000 | Greater West | 5,025.97 |
| Allee | 10,000 | UDL | 10,062.65 |
| Olney | 37,500 | | 37,742.98 |
| Balaban | 15,000 | Anglo Dutch | 15,088.62 |
| Berman | 10,000 | UDL | 10,062.65 |
| Brock | 15,000 | NAFCO | 15,088.62 |
| Carlin | 30,000 | | 30,187.97 |
| Corey | 10,000 | UDL | 10,062.65 |
| DeMatoff | 10,000 | Greater West | 10,062.65 |
| Diekmann | 6,250 | | 6,290.50 |
| Dimitman | 15,000 | | 15,088.62 |
| Drews[1] | 5,000 | | 5,025.97 |
| Fisher | 25,000 | Anglo Dutch | 25,161.99 |
| Ford | 15,000 | | 15,088.62 |
| Forsberg | 6,250 | | 6,290.50 |
| Gettelman | 0 | | 0 |
| Gilbert | 6,250 | | 6,290.50 |
| Goldberg | 20,000 | Anglo Dutch | 20,125.31 |
| Gurdin | 30,000 | Anglo Dutch | 30,187.97 |
| Harrington | 35,000 | Greater West | 35,213.93 |
| Heldman | 5,000 | Greater West | 5,025.97 |
| Joe | 15,000 | Greater West | 15,088.62 |
| Kahan | 20,000 | | 20,125.31 |
| Kaplan | 30,000 | | 30,187.97 |
| Kennedy | 40,000 | Greater West | 40,250.61 |
| Levy | 40,000 | Greater West | 40,250.61 |
| Lewis | 10,000 | | 10,062.65 |
| London | 20,000 | | 20,125.31 |
| Lovin | 10,000 | Greater West | 10,062.65 |
| Lusher | 15,000 | Anglo Dutch | 15,088.62 |
| Lusk | 20,000 | Greater West | 20,125.31 |
| Mack | 10,000 | Greater West | 10,062.65 |
| Magana | 52,500 | | 52,831.61 |

| | | | |
|---|---|---|---|
| Maietta | $25,000 | UDL | $25,161.99 |
| Marcus | 25,000 | | 25,161.99 |
| Martin[1] | 20,000 | | 20,125.31 |
| Morris | 25,000 | Anglo Dutch | 25,161.99 |
| Pitt | 15,000 | Anglo Dutch | 15,088.62 |
| Rafferty | 25,000 | Greater West | 25,161.99 |
| Robinson | 15,000 | NAFCO | 15,088.62 |
| Roselinsky | 10,000 | Greater West | 10,062.65 |
| Rosenthal | 20,000 | UDL | 20,125.31 |
| Rowan[1] | 20,000 | | 20,125.31 |
| Schmidt | 6,250 | | 6,290.50 |
| Schwartz | 10,000 | Greater West | 10,062.65 |
| Shaw | 20,000 | | 20,125.31 |
| Shell | 15,000 | UDL | 15,088.62 |
| Sievers | 30,000 | Greater West | 30,187.97 |
| Soares | 20,000 | | 20,125.31 |
| Stewart | 25,000 | Greater West | 25,161.99 |
| Thies[1] | 45,000 | | 45,287.29 |
| Thompson | 15,000 | Greater West | 15,088.62 |
| Weinstock | 15,000 | NAFCO | 15,088.62 |
| | 1,065,000 | | 1,071,635.08 |

[1] Indicates partners who are not petitioners in these cases.

The total net partnership loss was allocated among the partners in proportion to the 1966 *cash* capital contributions of the partners, without regard to the relative values of the San Diego property, contributed by the original Del Cerro Associates partners, and the Thousand Oaks property, contributed by the original McAvoy investors.

In her individual income tax return for 1966, petitioner deducted $15,000 as her share of the loss of Del Cerro 1966 (limited by the amount of her 1966 cash capital contribution). Respondent disallowed the partnership's claimed loss, and accordingly, disallowed the deductions claimed by the various partners, including petitioner, for their respective shares of such loss.

### Nana Berman and William Berman
### (Del Cerro Associates—1967)

Most of the facts have been stipulated and such stipulated facts are found accordingly. Petitioners are husband and wife residing in Hillsborough, Calif. They filed their 1965, 1966, and 1967 income tax returns with the District Director of Internal Revenue, San Francisco.

Del Cerro 1966, as referred to in the foregoing findings of fact, continued as the same partnership entity in 1967. For convenience of reference, our findings of fact and discussion concerning activities and events subsequent to 1966 will refer to the partnership as Del Cerro.

During 1967 Sunset was experiencing serious financial difficulties and began negotiations with numerous creditors, including several major financial institutions, as well as Del Cerro. Sunset was in default under its agreements with Del Cerro concerning Sunset's development of the Thousand Oaks property (i.e., the agreement for improvement of land, joint venture agreement and indenture of lease, described in our findings of fact in Ain, *supra*). After several months of negotiations the arrangements between Sunset and Del Cerro were revised by two separate but interrelated agreements dated December 8, 1967, and December 15, 1967, respectively. The net effect of these agreements may be summarized as follows:

(1) The purchase-money notes due from Del Cerro to Sunset with respect to the San Diego property ($1,256,000 and $200,000) and the Thousand Oaks property ($700,000) remained in effect, but without "personal" liability (i.e., should Del Cerro fail to make payment, Sunset's only recourse would be to foreclose and retake the respective properties; it could not otherwise enforce payment of the notes). The two notes, totaling $1,456,000, held by Sunset in connection with the San Diego property remained pledged to Del Cerro as collateral for performance by Sunset of its obligations concerning the repurchase options under the Thousand Oaks agreements (see paragraph (3) below).

(2) Sunset was required to pay to Del Cerro $1,200,000 in cash on or before January 15, 1968, or alternatively, at the option of Sunset, to deliver to Del Cerro, on or before March 1, 1968, 110,000 shares of common stock of Commonwealth United Corp. (CUC), a public company which, at that time, was planning to merge with Sunset. In the event that Sunset should elect to deliver the CUC shares, it would, in effect, guarantee that the average market price of such shares from March 15 to September 30, 1968, would not be less than $12 per share. (A mechanism was provided for the delivery of additional shares, or cash, subsequent to September 30, 1968, in the event that such average market price fell below $12 per share.)

(3) All other obligations of the parties to each other in connection with both the San Diego property and the Thousand Oaks property were canceled, except that in the event that Sunset should fail to entirely perform its obligations described in (2) above, it would technically continue to be obligated (but without "personal" liability) to continue to make the $30,000 semiannual option payments under the original indenture of lease and joint venture agreements in connection with the Thousand Oaks property (and eventually to exercise the option to repurchase the property for the joint venture). Since this obligation would continue without "personal" liability, the only remedy available to Del Cerro would be to foreclose on the collateral securing Sunset's obligation, i.e., the notes totaling $1,456,000 in connection with the San Diego property. The net effect of these arrangements was that the $1,456,000 of notes from Del Cerro to Sunset, in effect, became collateral for Sunset's performance of its obligations, as described in (2) above, under the settlement agreements. Should Sunset fail to perform (and fail to make the Thousand Oaks option payments), then Del Cerro would be entitled to reclaim and cancel its $1,456,000 in notes payable to Sunset, and thus, would end up with the San Diego property without further obligation to Sunset.

As of December 29, 1967, Del Cerro entered into an agreement with World Minerals, modifying the $6,800,000 obligation of Del Cerro to World Minerals, which Del Cerro in 1966 had assumed from the original McAvoy investors (see our findings of fact in Thompson, *supra*). The principal provisions of this agreement may be summarized as follows:

(1) Del Cerro was relieved of all obligations to pay interest on the indebtedness from and after January 1, 1967, provided that the principal amount would be paid in full no later than December 31, 1970.

(2) The consideration which Del Cerro was to receive from Sunset in early 1968 under the settlement agreements summarized above (either $1,200,000 in cash or 110,000 shares of CUC stock, at the option of Sunset) was to be paid over, immediately upon receipt by Del Cerro, to World Minerals and applied against Del Cerro's indebtedness. In the event that the 110,000 shares of CUC stock was delivered, it was to be credited at a value of $1,320,000.

(3) Del Cerro was to immediately transfer to World Minerals its interest in the San Diego property, subject to the purchase-money indebtedness of $1,456,000. The property was assigned a gross value of $2,250,000,[16] resulting in a net value, after related indebtedness, of $794,000, which amount was to be credited against Del Cerro's $6,800,000 balance due to World Minerals.

(4) Del Cerro assigned to World Minerals its interest in an asset referred to as the "St. Martins Hotel Loan" at an agreed value of $50,000, to be credited against the $6,800,000 indebtedness.

(5) Del Cerro was given the right until December 1, 1968, to assign to World Minerals any or all of its remaining assets for credit against the balance of Del Cerro's indebtedness. Any such assigned assets were to be valued "at a price to be agreed upon between the parties or at a price determined by arbitration should agreement not be reached by the parties," but not less than "the book value of such items after straight line depreciation."

During 1967 all but 6 of the 54 Del Cerro partners contributed additional amounts to the capital of the partnership. Such contributions ranged in amount from $5,000 to $125,000, and totaled $1,178,317. Thirty-five of the partners made their contributions utilizing funds borrowed for that purpose. In its partnership income tax return for 1967, Del Cerro reported a net loss of $4,543,035, computed as follows:

| | | |
|---|---:|---:|
| Income realized on receipt of CUC stock | | $1,200,000 |
| Option income realized | | 120,000 |
| Gain on sale of San Diego property to World Minerals | | 794,000 |
| Gain on sale of St. Martins property to World Minerals | | 25,000 |
| Rental income realized | | 10,493 |
| | | 2,149,493 |
| Less: | | |
| Writeoff of intangible assets | $6,254,500 | |
| Writeoff of loan commitment fee | 370,000 | |
| Loss on Fresno property | 24,781 | 6,649,281 |
| Gross profit (loss) | | (4,499,788) |
| Less: Other deductions (net of other income) | | 43,247 |
| Net loss | | (4,543,035) |

---

[16] This amount coincides with the agreed resale price established in the Lion agreement described in our findings of fact in Kahan, *supra*.

Petitioner William Berman contributed $20,000 to the capital of Del Cerro in 1967. His allocated share of the partnership's net loss, as reported in the partnership's 1967 return, was $42,250.[17] Berman claimed a partnership loss of $19,937.35 from the Del Cerro partnership in his 1967 joint personal return and an additional $62.65 in his petition herein. This loss was disallowed in its entirety by respondent.

OPINION

*Kahan*

There is virtually no dispute as to the facts in this case. Almost all of the facts were stipulated, and most of the significant elements in analyzing the transactions in question are to be found in the stipulated documents. On their face the documents indicate a purchase of land by the Del Cerro Associates partnership for notes, with no cash downpayment, and a prepayment of 4 years' interest on the notes.[18] Respondent has challenged the claimed prepaid interest which had been deducted in full in the partnership's 1965 Federal income tax return.

Respondent takes the position that, although the payment by Del Cerro Associates of $349,450 to Sunset was in the form of prepaid interest on a debt of $1,456,000, the transaction was in substance a loan of $349,450.[19] Cf. *United National Corp.,* 33 B.T.A. 790 (1935).

While we agree with respondent that the transaction contains several elements tending to indicate that its substance was other than its form, petitioners, through the stipulated facts and relevant documents, have made a prima facie case based upon the form of the transaction, and it is not clear from the record that there was, in economic substance, a loan here.

---

[17] The allocation of the aggregate 1967 partnership net loss among the 54 partners appears to bear no relationship to either the relative capital accounts or the relative 1967 contributions of the partners. The method of allocation is not determinable from the record.

[18] Since the transaction in question took place in 1965, it is not subject to the provisions of Rev. Rul. 68-643, 1968-2 C.B. 76, which requires an allocation of the deduction for prepaid interest over the years involved. This ruling has no retroactive effect as to prepayments for periods not in excess of 5 years made prior to Nov. 26, 1968.

[19] In the statutory notice, respondent characterized the payment by the partnership as a "nondeductible capital investment." It is not clear what this characterization was intended to mean, since the only position taken by respondent at trial and on brief was that the substance of the transaction was a loan.

The letter agreement of August 28, 1965, is a rather straightforward contract of sale. Del Cerro Associates actually took title to the property, Sunset received valid, enforceable promissory notes for $1,456,000 (secured by a mortgage on the property, except as to $200,000 which was unsecured), and Del Cerro Associates actually paid Sunset $350,000 in cash. These clear indicia of an unconditional sale are, however, significantly beclouded when viewed together with the September 28, 1965, agreement between Del Cerro Associates and Lion. While this agreement purports to be merely an agency contract, appointing Lion as agent for sale of the property for Del Cerro Associates, a careful reading of its terms indicates that it is in substance an artfully disguised *option* to Sunset (through Lion, its wholly owned subsidiary) to reacquire the property from Del Cerro Associates.

The Lion agreement was certainly unorthodox as a real estate brokerage contract. Lion was given rights to improve the property and the "sole and exclusive right to sell" the property at a minimum price of $2,250,000. This exclusive agency was for an indefinite period and was essentially not terminable by the property owner without the consent of the agent. Lion was to pay all taxes and other carrying costs on the property prior to its sale. (Under the original letter agreement of sale, Sunset was required to service the existing first mortgage debt.) Del Cerro Associates was obligated to accept the minimum selling price of $2,250,000, and upon receipt of such amount, "to deliver the Property to the purchaser free and clear." This combination of rights and obligations is tantamount to an option in Lion to repurchase the property for $2,250,000.

Respondent contends that at the time that Del Cerro Associates acquired the San Diego property for $1,456,000 it was contemplated by both buyer and seller (Sunset) that the property would be reacquired by Sunset (through the mechanism of the Lion agreement) at a later date and at a higher price ($2,250,000), the higher price being in compensation for the use of the money received by Sunset, purportedly as prepaid interest, during the period that Del Cerro Associates held title. Thus, he asserts, the contractual arrangements, viewed as a whole, amounted to a loan by Del Cerro Associates of the amount of cash which it paid to Sunset, purportedly as interest. The net return which could have been expected by Del Cerro Associates from this cash investment

was, respondent contends, limited to a maximum amount, which in relation to the amount invested, was equivalent to interest. Respondent computes the amount as follows:

| | |
|---|---:|
| Anticipated resale price | $2,250,000 |
| Less: First mortgage to be paid off by Del Cerro Associates | (360,000) |
| Payoff of original purchase-money notes to Sunset | (1,456,000) |
| Net cash proceeds from resale | 434,000 |
| Less: Original cash investment by Del Cerro Associates | 350,000 |
| Net cash gain | 84,000 |

The net gain is equivalent to 24 percent of the $350,000 cash invested at the outset by Del Cerro Associates. Respondent asserts that the expected time frame for "resale" of the property was 4 years (based upon the interest prepayment period), and, thus, the $84,000 net gain would amount to a return of 6 percent per year simple interest over the 4-year period. Since most of the Del Cerro Associates partners had borrowed the money which they invested, the economic gain (other than the income tax benefits) to these partners would be zero, with the income merely offsetting the cost of borrowing the money which was invested.[20] Meanwhile, all of the parties will have realized a substantial income tax benefit through the deduction of nearly $350,000 by the partnership as prepaid interest in 1965.

While we find respondent's analysis quite persuasive, it contains a number of gaps which prevent us from being able to conclude with sufficient assurance that the substance of the transaction was as respondent contends. While we are convinced that the Lion agreement constituted an option to Sunset to repurchase the property, it did not *require* Sunset to repurchase. This fact seriously undermines the theory that the cash paid to Sunset was a loan to be repaid at the time of Sunset's "repurchase"; there was simply no binding obligation to repay the "loan" (i.e. to "repurchase" the property). See *Irving Fisher,* 30 B.T.A. 433, 440 (1934). Thus, for example, Sunset could have decided not to repurchase the property and could have abandoned the Lion agreement by merely causing Lion to discontinue paying the real estate taxes and other carrying costs on the property. In such an event Del Cerro Associates would have exclusive control over the property and bear all of the risks

---

[20] Respondent appears to assume that the rate of interest on the borrowings of the partners was 6 percent per annum, although this cannot be determined from the record.

of ownership. Not only would it not be entitled to any repayment from Sunset, but it would still be obligated to ultimately pay its original notes to Sunset, with interest accrued after the fourth year.

Respondent appears to presume that it was a foregone conclusion that Sunset was bound to repurchase the property. Although neither the August 28, 1965, letter agreement with Sunset nor the September 28 "agency" agreement with Lion requires either Sunset or Lion to repurchase the property, it is possible that such a repurchase could have been assured by a separate side agreement (formal or informal) or by the possible fact that the original selling price to Del Cerro Associates and Sunset's $2,250,000 repurchase option price were so far below the market value of the property that, as a practical matter, Sunset was bound to exercise its option, in order to preserve for itself the excess market value. But cf. *Irving Fisher, supra* at 441. However, neither of these possible conditions is discernible from the record, and thus there is no basis for concluding that Sunset was bound to repurchase the property.

Although Sunset may not have been required to repurchase the property, the existence of the "option" to repurchase at a fixed price of $2,250,000 placed an effective ceiling on the potential return available to Del Cerro Associates on its investment. Such a ceiling is inconsistent with the unlimited potential gain or loss normally attendant upon an equity investment, and it tends to make the economics of the transaction for Del Cerro Associates more like that of a secured debt investment. It is difficult to believe that anyone in the position of a true beneficial owner, seeking to maximize potential gain, would enter into an agreement such as the Lion agreement.

In spite of the foregoing, however, Del Cerro Associates' position does involve some of the characteristics of an equity investment. Respondent computes the maximum potential gain to Del Cerro Associates as $84,000 (in the table above) and asserts that this represents no more than a 6-percent annual return over 4 years. However, the exact time at which the property would be repurchased, if ever, was indeterminate. If it were repurchased after 1 year, for example, the $84,000 gain would represent a 24-percent annual rate of return, considerably more than would be expected by a lender. If the property were not repurchased until after 4 years, the rate of return would have

been considerably less than 6 percent per annum. And, of course, if the property were not repurchased at all, which was a possibility, Del Cerro Associates would end up with all of the risks and rewards of equity ownership. See, e.g., *United States v. Title Guarantee & Trust Co.,* 133 F.2d 990, 993 (6th Cir. 1943).

Petitioners, who bear the burden of proof, have, through the stipulated facts and documents embodying the transaction, made a prima facie case in support of their characterization and tax reporting of the transaction. Since we are unable to conclude with sufficient assurance that the transaction in question was in substance a loan, as respondent contends, petitioner's deduction for prepaid interest in accordance with the formal structure of the transaction must be sustained.[21] Accord, *Resthaven Memorial Cemetery, Inc.,* 43 B.T.A. 683 (1941).

### Ain

Respondent characterizes the series of transactions involved in Ain as, in substance, a loan of $475,000 from the McAvoy investors (through a series of intermediate entities) to Sunset. Relying heavily on the formal elements of the transactions, which are reflected in the many stipulated documents, petitioners vigorously refute respondent's characterization. Here, as in Kahan, we must scrutinize the substance of the transactions in determining appropriate tax consequences.

Respondent's position, although not as fully developed on brief as it might have been, appears essentially as follows: Sunset desired to raise cash and generate sales of land before August 31, 1965, but to maintain control over, and an indirect interest in, any property sold solely to meet these short-term needs. The Thousand Oaks property was worth approximately $700,000. A transaction was negotiated in which the property was to be "sold" for $700,000 in promissory notes, but with Sunset receiving $650,000 in cash in the form of prepaid interest ($280,000) and a financing fee ($370,000). At the same time, however, Sunset committed itself to provide all funds for development of the property, and to ultimately repurchase the property for the joint venture at not less than $1,360,000. The end result of this series of steps would be that Sunset would have

---

[21] Respondent has not challenged the deduction of the prepaid interest as a distortion of income under sec. 446, I.R.C., as amended. See n. 18 *supra,* and compare *Andrew A. Sandor,* 62 T.C. 456, affd. 536 F.2d 874 (9th Cir. 1976).

had the use of the $650,000 in cash (less the $30,000 semiannual payments to maintain the repurchase "option") until such time as it would have "repurchased" the property at $1,360,000 by repaying $660,000 in cash and canceling the original $700,000 purchase-money mortgage receivable.

Although couched in the form of a sale and repurchase of property, the substance of the transaction does appear to be a loan, as respondent contends, particularly in light of the fact that Sunset was obligated to repurchase the property (at a price which would return the $650,000 cash originally received by Sunset, plus an extra $10,000), and Sunset, therefore, continued to bear the risks and rewards of ownership. See *United National Corp., supra.*

Petitioners make much of the fact that the $475,000 which was paid (and deducted on their individual tax returns) in 1965 by the McAvoy investors was not part of the $650,000 received by Sunset, but rather was paid as interest to World Minerals (as assignee of ABC) in an entirely different transaction: the purchase of the McAvoy stock from ABC for $6,800,000 in personal notes. Therefore, petitioners contend, the McAvoy investors could not possibly be considered to have made a loan to Sunset. Respondent contends that, despite the elaborate network of entities and transactions, in ultimate substance the money paid by the McAvoy investors (most of which was in turn borrowed for the purpose) was the source of the money received by Sunset. Respondent attempts, although with considerable difficulty, to trace the flow of funds from UDL through the McAvoy investors, World Minerals, and ABC, to Sunset.

Although respondent's thesis is quite persuasive, the record, despite voluminous stipulations of fact, is not clear on the matter. However, we do not consider it necessary to closely scrutinize the alleged flow of funds and to determine whether or not the transaction was in substance a loan to Sunset. Whether or not the $475,000 paid in 1965 by the McAvoy investors is characterized as such a loan, we hold that such payment does not qualify as tax-deductible interest because the purported resale of the McAvoy stock by ABC for $6,800,000 in notes (with respect to which the claimed interest was paid) was not a bona fide sale, but was a sham transaction which cannot be recognized for tax purposes. *Knetsch v. United States,* 364 U.S. 361 (1960).

In 1965, all of the stock of McAvoy, then a corporate shell, was acquired by ABC for $750. ABC subsequently contributed an additional $650,000 to the capital of McAvoy, for a total investment of $650,750. In late August 1965, the Thousand Oaks property was sold by Sunset to McAvoy for $700,000 in the form of a purchase-money mortgage. McAvoy paid Sunset an additional $280,000 in prepaid interest and $370,000 as a financing fee, which amounts were capitalized. Thus, McAvoy held assets with a book cost of $1,350,000, subject to a long-term mortgage of $700,000. *Within 3 months* after these transactions with Sunset, ABC resold 98.583 percent of its McAvoy stock to the 30 McAvoy investors for $6,800,000, *more than 10 times its cash investment in such stock and more than 10 times the stock's book value.* Under the circumstances, the bona fides of such an arrangement are suspect on their face; a purchase and resale within 3 months at a tenfold increase in price strains reasonable credulity. Cf. *Norman Titcher,* 57 T.C. 315 at 322 (1971).

Petitioners contend that the $6,800,000 price at which the stock was resold to the McAvoy investors by ABC was not unrealistic. They acknowledge that the Thousand Oaks property itself had a fair market value of only $700,000, but they contend that the execution by McAvoy of the related agreements with Sunset for the development of the property (i.e., the agreement for improvement of land, joint venture agreement, and indenture of lease) caused an immediate dramatic increase in the value of the property as a multimillion dollar development project. Kahan testified that the McAvoy investors expected to realize a profit in the area of $10 million at the end of a 10- to 12-year period, through the development of the property under the arrangements with Sunset. We fail to see much justification for the McAvoy investors to have paid anything more than $700,000, let alone nearly 10 times that much.

At the time that the development arrangements with Sunset were entered into, Sunset's ability to fully perform must have been at least questionable, due to its financial difficulties. This is borne out by the fact that Sunset eventually went into bankruptcy without ever having performed. Moreover, the development arrangements with Sunset were an integral part of the transaction in which McAvoy purchased the land, although reflected in separate documents all dated August 31, 1965. Thus, whatever value may have been added to the property by the

development arrangements existed at the time of McAvoy's purchase for $700,000, and it cannot be said that the alleged tenfold increase in value was created between that time and the time of subsequent resale to the McAvoy investors.

The McAvoy investors, or at least a portion of them, were clients of Kahan and/or Harry Margolis. Kahan and Margolis were familiar with Sunset's 1965 yearend efforts to "syndicate" some of its properties and were familiar with the Thousand Oaks property in particular. Why then did not the McAvoy investors acquire the Thousand Oaks property directly from Sunset for $700,000, rather than acquire it (through the McAvoy stock purchased from ABC) for $6,800,000, less than 3 months later? It is inconceivable that Kahan or Margolis would have advised their clients to purchase, in a bona fide transaction, property for $6,800,000, which could have been acquired less than 3 months earlier for approximately one-tenth of that amount. Our doubts about the bona fides of such a transaction are reinforced by the relationship of Harry Margolis and ABC, the initial purchaser (through McAvoy) of the property from Sunset. ABC was a small Bahamian trust company in business as a professional trustee, which until mid-1965, did not even have an office of its own. Although the acquisition, funding, and resale of McAvoy were done in the name of ABC, the funds were obtained by ABC from a trust, and it is doubtful that ABC was acting for its own beneficial interest. The party(s) of beneficial interest are not determinable from the record. This gives rise to the suspicion that the funds may have been provided by a trust which had been established at ABC by one or more clients of Harry Margolis, who had been doing business with ABC (establishing trusts for clients) since 1963. In any event the connection between Harry Margolis and the McAvoy investors on the one hand and Harry Margolis and ABC on the other, leads to the impression that in planning the Thousand Oaks transactions with Sunset, ABC may have been intentionally interpositioned between Sunset and the McAvoy investors for the purpose of altering the appearance of the transaction in order to artificially create income tax deductions.

In this connection, we think it is more than coincidence that the $680,000 which was to be paid by the McAvoy investors in 1965 in the form of interest (at 10 percent on the aggregate alleged indebtedness of $6,800,000) exceeded by only $30,000 the

cash received by Sunset in the Thousand Oaks transaction in 1965. Thus, instead of the McAvoy investors dealing directly with Sunset, the transaction was structured with ABC as an intermediate entity, reselling the property to the McAvoy investors at a price having no relation to market value, but fixed at such a level that the $680,000 to be paid by the McAvoy investors in 1965 (and, presumably, in years thereafter) could be labeled as tax-deductible interest on such amount.

A similar situation arose in *Martin M. Melcher,* a Memorandum Opinion of this Court.[22] In that case the taxpayers sought to purchase a home which was available for $89,250. Instead of the taxpayers' purchasing the property directly for that price, the property was purchased by a corporation controlled by the taxpayers and their attorney, and thereupon "resold" by such corporation to the taxpayers for $110,000, with a $30,000 downpayment and a 15-year note for $80,000. In addition to the $30,000 downpayment, the taxpayers paid $76,000 as "prepaid interest" for the full 15-year period. We held that the purported purchase by the corporation and its alleged "resale" to the taxpayers was a sham, and that, therefore, the purported purchase-money note was not a real and bona fide indebtedness, and no interest deduction was allowable for tax purposes. The same rationale applies in the instant case.

Although the relationship between the $650,000 received by Sunset and the $680,000 to be paid by the McAvoy investors to World Minerals (of which $425,000 was paid and is at issue herein) is not clearly discernible from the record, in circumstances such as those recited above, where the surrounding facts so clearly give rise to the inference that the purported purchase and "resale" by ABC were not bona fide transactions, it is incumbent upon the petitioners, who bear the burden of proof herein, to establish otherwise. They have not done so, and, accordingly, we hold that the payments at issue herein are not deductible as interest for tax purposes. *Knetsch v. United States, supra; James A. Collins,* 54 T.C. 1656 (1970); *Norman Titcher, supra* at 325.

---

[22] T.C. Memo. 1970-237 (1970), affd. without discussion of this point 476 F.2d 398 (9th Cir. 1973).

*Thompson*

The issues for decision in the Thompson case derive from interest deductions claimed in the 1966 tax return of Del Cerro 1966. The items of interest so claimed were (1) $825,000 paid to World Minerals as interest on the $6,800,000 "indebtedness" assumed by Del Cerro 1966 from the former McAvoy investors, and (2) $245,000, representing a complete writeoff of the prepaid interest account taken over by Del Cerro 1966 from the books of McAvoy at the time of liquidation of McAvoy into Del Cerro 1966.

Our holding in Ain, *supra,* that the $6,800,000 of alleged indebtedness of the McAvoy investors was a sham and could not be recognized as bona fide indebtedness with respect to which tax-deductible interest could be allowed, is also controlling in Thompson. Although the $6,800,000 of "indebtedness" upon which the $825,000 of interest was claimed in 1966 was no longer that of the 30 McAvoy investors individually, but had been assumed in total by Del Cerro 1966, Del Cerro 1966 was essentially in the position of a transferee of the McAvoy investors, and, therefore, the assumed "indebtedness" must be viewed as the same as that which derived from the transactions found to have been a sham in 1965. Accordingly, the $825,000 claimed in 1966 as interest on such alleged indebtedness cannot be allowed. *Knetsch v. United States, supra.*

The $245,000 of unamortized prepaid interest acquired by Del Cerro 1966 upon the liquidation of McAvoy, and subsequently written off by Del Cerro in 1966, presents a different question. Respondent contends that the $280,000 originally paid to Sunset by McAvoy ·as prepaid interest (of which $245,000 was the unamortized balance taken over by Del Cerro 1966), together with the $370,000 prepaid financing fee, was in substance a *loan* to Sunset, and not prepaid interest. Although respondent's position has considerable merit, considering all the facts and circumstances surrounding the Thousand Oaks transactions, we do not find it necessary to make a determination on that issue, since we believe that the $245,000 deduction must be disallowed for other reasons.

Even if the $245,000 acquired by Del Cerro 1966 from McAvoy is properly characterized as prepaid interest, we fail to see a legal basis for the writeoff of that entire amount as a tax deduction in

1966. Section 163(a)[23] allows a deduction for interest *"paid or accrued within the taxable year."* In general, a cash basis taxpayer may deduct interest payments only in the year paid, and an accrual basis taxpayer may deduct interest only for the period in which it accrues, regardless of when paid. Sec. 1.461-1(a), Income Tax Regs. *Massachusetts Mutual Life Insurance Co. v. United States,* 288 U.S. 269 (1933). McAvoy was an accrual basis taxpayer, and accordingly, the $280,000 paid to Sunset in 1965 was capitalized, to be amortized over the 4-year period to which the interest related. When the unamortized balance of $245,000 was succeeded to by Del Cerro 1966, it was written off, on the grounds that Del Cerro 1966 was a cash basis taxpayer and not required to capitalize and amortize prepaid interest. The flaw in this reasoning, however, is that even though Del Cerro 1966 was a cash basis taxpayer, a cash basis taxpayer may deduct accrued interest only when actually paid. Sec. 163. *Lewis C. Christensen,* 40 T.C. 563 (1963). In the instant case the $245,000 was not *paid* by Del Cerro in 1966; it had been *paid* during the prior year by McAvoy. To the extent that Del Cerro 1966 may be deemed to have "paid" something when it acquired the unamortized prepaid interest account upon the liquidation of McAvoy, what it "paid" was not interest expense in 1966, but the cost of acquiring an intangible asset.

Accordingly, we hold that respondent's disallowance of the 1966 interest deductions claimed by Del Cerro 1966, in the total amount of $1,070,000, must be sustained. Cf. *Rodney, Inc.,* 2 T.C. 1020 (1943), affd. 145 F.2d 692 (2d Cir. 1944).[24]

### Berman

For the year 1967, Del Cerro reported a loss of $4,543,035 in its partnership income tax return. Portions of this loss were deducted by the Del Cerro partners in their 1967 individual returns, and respondent has disallowed such deductions based

---

[23] Unless otherwise indicated, all section references herein are to the Internal Revenue Code of 1954, as amended.

[24] The disallowance of these interest deductions would still leave a net loss of $1,635.08 out of the total net loss of $1,071,635.08 originally reported by Del Cerro 1966. Although respondent's notice of deficiency disallows the entire claimed net loss of Del Cerro 1966, the litigation herein has been concerned only with the $1,070,000 of claimed deductions, and none of the deductions which constitute the $1,635.08 balance of the reported loss have been dealt with by either party at trial or on brief. Accordingly, petitioner, who has the burden of proof herein, must be deemed to have abandoned any claim she may have had to any portion of the remaining alleged partnership loss.

upon his determination that the partnership in fact did not have a net loss in 1967.

Del Cerro's claimed net loss is based principally upon its "writeoff of intangible assets" in the amount of $6,254,500. The "intangible assets" written off were the "Contractual Rights and Interests" which had been placed on Del Cerro's books in 1966 at the time of the dissolution of McAvoy into Del Cerro, as discussed in Thompson, *supra.* However, petitioners have failed to establish either a legal or a factual basis for the partnership's deduction of this item.

It is true that the 1967 settlement agreements between Sunset and Del Cerro terminated the previous contractual arrangements under which Sunset was to develop the Thousand Oaks property. Petitioners' position is that such termination represented a deductible loss to Del Cerro to the extent of the book value of Del Cerro's contractual rights, or $6,254,500. However, petitioners have failed to establish that such contractual rights had a tax basis upon which the claimed loss deduction could have been based.

Section 165 permits a loss deduction for the sudden termination of usefulness of nondepreciable property used in business or in a transaction entered into for profit. Sec. 1.165-2(a), Income Tax Regs. However, the amount allowable is measured by, and limited to, the tax basis of the property in question. Sec. 1.165-1(c)(1), Income Tax Regs. The alleged "Contractual Rights and Interests" had no tax basis. At the time that the Thousand Oaks property was acquired by McAvoy from Sunset, and the development agreements with Sunset were executed, McAvoy recorded on its books the cost of the land ($700,000), but the so-called "Contractual Rights and Interests" arising from the development contracts were not separately recorded with their own cost basis. Indeed, they could not have been, since they did not have any cost to McAvoy. Therefore, they had no tax basis, regardless of what their value may have been to McAvoy.[25]

Petitioners contend, however, that upon the dissolution of McAvoy into Del Cerro in 1966, the "Contractual Rights and

---

[25] Petitioners do not contend that any portion of the $700,000 purchase price of the land should have been allocated as the basis of the related "Contractual Rights." Compare *Louisiana Land & Exploration Co. v. Commissioner,* 161 F.2d 842 (5th Cir. 1947), affg. 7 T.C. 507 (1946).

Interests" received by Del Cerro were properly recorded on Del Cerro's books as a separate asset with a basis of $6,254,500. We find no justification in fact or law for this contention. In Ain, *supra,* we have already discussed the question of whether the rights under the Sunset development agreements had any significant value beyond the cost of the Thousand Oaks property itself. There we set forth a number of reasons why we thought that they did not. Without repeating the details, suffice it to say that our discussion of this matter in Ain is equally applicable here, and that petitioners have not established that the contractual arrangements with Sunset had any separate value at the time of the dissolution of McAvoy into Del Cerro 1966.

If the so-called "Contractual Rights and Interests" involved here had in fact had a value of $6,254,500 at the time of liquidation of McAvoy, and such value had properly been assigned as basis by Del Cerro (presumably, pursuant to section 334(a)), then the McAvoy investors collectively would have realized a taxable gain in approximately that amount upon such liquidation.[26] The record does not indicate that such a gain on liquidation was recognized, and we seriously doubt that the McAvoy investors, who (through their advisers) were highly conscious of tax planning in all of the transactions involved in these cases, would have liquidated McAvoy in a manner which would have triggered recognition of a gain of several million dollars. Thus, it would appear that in connection with the tax treatment of the liquidation of McAvoy, the McAvoy investors did not assign a $6,254,500 value to the "Contractual Rights and Interests."

For the reasons discussed above, we conclude that the so-called "Contractual Rights and Interests" had no tax basis which could have been written off as a loss under section 165. Kahan testified that the value of the development arrangements with Sunset was in the potential future gain to Del Cerro from such development. Thus, the loss sustained by Del Cerro as a result of the termination of the development arrangements with Sunset was in the nature of a loss of an asset without an established tax basis. Loss

---

[26] Although the technical mechanics of the liquidation and dissolution of McAvoy into Del Cerro, and the assumption by Del Cerro of the McAvoy investors' notes to World Minerals, are not determinable from the record, we are unable to perceive any legal method through which Del Cerro could have recorded the "Contractual Rights and Interests" at a stepped-up basis without a corresponding recognition of gain to the McAvoy investors. Secs. 331-334.

of potential profit is not an allowable tax deduction. *J.G. Boswell Co. v. Commissioner,* 302 F.2d 682 (9th Cir. 1962), affg. 34 T.C. 539 (1960), cert. denied 371 U.S. 860 (1962); *Frank F. Nicola,* 1 B.T.A. 487 (1925).

Because the disallowance of the claimed "writeoff of intangible assets" in the amount of $6,254,500 totally eliminates the overall net loss reported by Del Cerro in 1967, we need not consider the propriety of the other deductions claimed in its 1967 return. On brief respondent has totally reconstructed Del Cerro's 1967 income and deductions, based upon his view of the substance of the various transactions involved, with a resulting net *income* of $450,712. However, we need not make a determination as to the correctness of this amount, nor of the various adjustments through which it was derived. Since respondent has not asserted increased deficiencies based upon his alleged net income of Del Cerro in 1967, but has merely disallowed the reported loss, our disallowance of the claimed $6,254,500 deduction discussed above, which disallowance eliminates the claimed net loss, is dispositive of the Berman case in favor of respondent.

*Decisions will be entered under Rule 155.*